## DOC BEASON v. STATE.

No. A-3276—Opinion Filed Feb. 21, 1921.

(195 Pac. 792.)

(Syllabus.)

1. **WITNESS—Impeachment by Showing Conspiracy.** In a prosecution for murder the state may, if it can, for the purpose of impeachment and to show bias, introduce evidence tending to show that a witness for the defendant conspired with the accused to aid him in the commission of the offense, although no conspiracy is charged in the information. The fact that such testimony, if otherwise competent, tends to show the commission of another offense, does not make it inadmissible to prove the offense charged.

2. **HOMICIDE—Harmless Error—Evidence.** Where certain testimony tending to show a premeditated design to commit murder is admitted over the objection of the accused, and the jury by its verdict, rejects the theory of premeditated homicide and brings in a verdict for manslaughter in the first degree, the admission of such testimony, even though it may have been erroneously admitted, is not prejudicial.

3. **TRIAL—Argument of Prosecution.** The county attorney had a right, in his argument to the jury, to state his conclusions drawn from certain portions of the evidence favoring the state's theory of conspiracy, although the evidence favoring such inference might not be strong nor clear. Assuming that the evidence favoring the state's theory was slight, it was for the jury to determine what weight should be given it.

4. **SUFFICIENCY OF INSTRUCTIONS.** The instructions complained of examined, and held fairly and fully to cover every phase and theory of both parties, as disclosed by the evidence.

5. **HOMICIDE—Admissibility of Dying Declarations.** The admissibility of a dying declaration is primarily a queston for the court. Ordinarily, when a dying declaration is offered in evidence, the court should require the necessary preliminary proof of its admissibility in the absence of the jury, but where no objection is made to the preliminary proof being made in the presence and hearing of the jury, its submission to the jury in that manner, if otherwise competent, is not prejudicial.

6. **SAME—Preliminary Proof.** The preliminary proof laying grounds for the admission of the dying declaration examined, and found sufficient.

*Appeal from District Court, Greer County;*

*T. P. Clay, Judge.*

Doc Beason was convicted of the crime of manslaughter in the first degree and sentenced to serve a term of 25 years in the state penitentiary, and he appeals. Affirmed.

*Garrett & Thacker* and *Stewart & Edwards,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *Sam Hooker,* Asst. Atty. Gen., for the State.

BESSEY, J. The plaintiff in error, hereinafter referred to as the defendant, was on the 31st day of January, 1917, informed against in the district court of Greer county for the murder of John W. Stinson on the 18th

day of January, 1917.   Upon trial in said court the
defendant was, on the 21st day of September, 1917, con-
victed of manslaughter in the first degree, and his pun-
ishment fixed at imprisonment in the state penitentiary
for a term of 25 years.   To reverse this judgment the
defendant prosecuted this appeal.

The defendant and the deceased were neighbors for
several years near Granite, in Greer county.   The evi-
dence shows that they had had some trouble in keeping
their stock from trespassing upon one another's land,
and that the day before the homicide the deceased had
sent one of his little boys to the home of the defendant
to request the defendant to come after his horses, which
were then trespassing upon a field belonging to the de-
ceased in which he had sown wheat and in which there
was a strawstack from which the horses were feeding.
At this time the defendant was not at home, and after
the boy returned and reported that fact to his father
the deceased started to drive these horses to the home
of the defendant, and on the way met the defendant's
wife coming after them.   Some words there passed be-
tween these two relative to the trespassing of the stock,
and it is contended by the defendant that the deceased
was abusive to defendant's wife and used profane and
violent language upon this occasion.   This was denied by
the state.   Several witnesses testified that the deceased
had never been known to use profane or indecent lan-
guage.

The next morning the defendant and the deceased
went to the town of Granite, and, so far as is disclosed
by this record, neither knew that the other would be
there, although, as is later brought out in the testimony

in the case, each carried a gun. The deceased went to the store of Howard & Guthrie, where he was accustomed to trade. The weather was cold, and before making his purchases he went to the stove for the purpose of warming. After some time the defendant came into the store. He was not in the habit of trading there, but he also went up to the stove, and, after warming for a few minutes, spoke to the deceased and said to him that he wished to speak with him on the outside. The deceased, on this invitation, went out of the front door of the store with the defendant, where they had some conversation in the vestibule relating to the trespassing stock. From the gestures of the parties and the sound of their voices the persons on the inside of the store could tell that they were quarreling. The deceased then entered the store door and made some inquiry of the defendant as to what the defendant had last stated, whereupon the parties began to fight.

While there is some conflict in the testimony, there were a number of witnesses who testified that the defendant was the aggressor, and that soon after the fight began he struck the deceased with a six-shooter, and that during this difficulty the deceased was backing up and trying to ward off the blows; that these blows, or some of them, stunned the deceased and caused him to stagger; that the defendant was a man 38 or 40 years of age, and weighed about 200 pounds, and that the deceased was a small man, 45 or 50 years of age, weighing about 125 pounds. It appears that the first shot fired killed an innocent bystander, and that the deceased, after he had received these blows, was shot by the defendant, and while stunned and partially prostrate upon the floor of

the store the defendant shot him again through the body. At the time the defendant fired the last shot he used some profane language towards the deceased, although the deceased at that time was begging him not to assault him.

There is some controversy as to where these parties were when the first shot was fired, but the testimony is convincing that the deceased went out of the store to talk with the defendant upon the latter's invitation, and, according to the testimony of a number of disinterested witnesses, the defendant was the aggressor, and the deceased made no attempt to draw a weapon until after he had been struck a number of times by the defendant, and until after the first or second shot had been fired.

There are eighteen assignments of error in this case, but the defendant in his brief complains of only three, viz.:

(1) The introduction of alleged incompetent and prejudicial testimony and the argument of plaintiff's counsel affecting the same.

(2) Certain alleged erroneous instructions given by the court and the refusal of the court to give the instructions offered by the defendant.

(3) Error in permitting the admission of the dying declaration of the deceased.

First. The defendant urges in his brief that this judgment should be reversed for the reason that the court permitted the witness Arley Griffin, on rebuttal for the state, to testify to matters tending to impeach the defendant's principal witness, Fred Linn, without having

first laid a sufficient foundation for such impeachment, and for the further reason that from this and other testimony the state attempted to show that there was a conspiracy between the defendant and Linn to provoke the quarrel. It is claimed by the defendant that this was reversible error because there was no sufficient foundation laid for impeachment and because there was no charge of conspiracy in the information, and that, if testimony tending to show conspiracy was admissible, it should have been introduced by the state, as evidence in chief, and that its reception as rebuttal testimony was error.

The statements of Fred Linn, witness for the defendant, in his examination in chief, relating to the facts and circumstances leading up to the tragedy and as to what occurred during the progress of the fatal quarrel, in many particulars differed from the statements of other witnesses. It was the theory of the state that Linn sought in his testimony, so far as he could, to mitigate the offense and to justify the homicide. For the purpose of showing that this witness was biased in favor of the defendant and to lay the foundation for impeaching certain portions of his testimony, the state was permitted to ask him if he did not say to Arley Griffin, at the time the deceased and the defendant were engaged in the fatal quarrel at the front of the store, "Come on; let's go down there and see a fight," and if he did not say to Arley Griffin at that time, "If Stinson fools with Doc Beason, Doc will not fool with him; he will kill him," to which the witness answered, "No, sir; Mr. Griffin said to me, 'What is the trouble?' and I said, 'Something about some stock.' They kept standing there

quarreling, and he says, 'Wonder if they are going to fight?' and I says, 'If he fools with him, Doc ought to slap hell out of him.'"

For the purpose of showing that this witness, Linn, had made other and contradictory statements as to what he said to Griffin, on rebuttal Arley Griffin was asked the following question: "At that time you may state whether or not Fred Linn stated to you that if Stinson monkeyed with Doc Beason that Doc would kill him, or words to that effect"—and over the objections of counsel for the defendant, the witness answered: "That is what he said; that if Stinson monkeyed with Doc that Doc would kill him."

It was the theory of the state that the defendant had told Linn, before they left home, what he intended to do, and that when Linn made this statement to Griffin he knew the purpose of the defendant in inviting the deceased to step out of the store with him. In this regard Linn had testified as follows:

"Q. When you got the milk buckets, you may state whether or not you heard Mrs. Beason telling about any trouble that she had had with Mr. Stinson that evening? A. I did.

"Q. What did she tell you about it? A. She said she went over to run the horses home that afternoon, and she said that Stinson abused her something awful.

"Q. What did she say? A. She said Stinson commenced cursing her, and she said she told him he ought to be ashamed to abuse a defenseless woman, and he said that he didn't have to abuse her; to send that husband of hers over and he would smoke with that son of a bitch. She said she very nearly run herself to death after the stock.

"Q. Did you tell Doc. Beason? A. I told him after he came out to the cow lot."

Under all these circumstances, we cannot say that rebuttal testimony on the part of Arley Griffin was prejudicial. On the contrary, we think it was admissible for purposes of impeachment and to show a premeditated design on the part of the defendant, and as a part of the res gestae. 22 Corpus Juris, 450; *Gibbons v. Ty.,* 5 Okla. Cr. 212, 115 Pac. 129.

The testimony of Fred Linn had a tendency to reduce the crime from murder to manslaughter, and, since the jury had adopted the latter theory, doubtless predicated on the testimony of Linn, defendant has no cause for complaint; otherwise, the verdict would have been for murder. *Duncan v. State,* 11 Okla. Cr. 217, 144 Pac. 217.

Defendant complains that the argument of the county attorney to the effect that there was a premeditated conspiracy between defendant and Linn to provoke a quarrel with deceased was improper and prejudicial. There was some evidence that such indeed was the fact. Defendant's witness Linn stated that after the deceased had been twice shot and mortally wounded and as he staggered away from the scene of the tragedy the defendant said to his victim, "Well, Stinson, I guess you got what you were looking for." This, together with the fact that the defendant called the deceased out of the store, armed with a deadly firearm, and commenced to quarrel with and strike the deceased with his pistol, justified the county attorney in drawing the inference that there was a premeditated conspiracy to provoke the fatal quarrel. The county attorney had a right in his argument to the

jury to state his conclusions drawn from the evidence, favoring the state's theory of the case, although the evidence favoring such inference might not be strong nor clear. Assuming that the evidence was slight, it was for the jury to determine what weight should be given it. *Douglas Jones v. State,* 19 Okla. Cr. —, 202 Pac. 187. But, since the jury, in bringing in a verdict of manslaughter instead of murder, did not adopt the theory of the county attorney that there was a conspiracy or that the homicide was committed with a premeditated design, therefore the defendant was in no way prejudiced by such argument. *Duncan v. State,* 11 Okla. Cr. 217, 144 Pac. 629, *supra.*

Second. The defendant complains of the language of the introductory paragraph of instruction No. 1, as follows:

"To this charge in the information the defendant has pleaded not guilty, and the court instructs you that you have been impaneled and sworn to try the question of his guilt or innocence and instructs you as to the law in the case as follows."

The language "to try the question of his guilt or innocence" was not aptly used, but, taken in connection with the context, it means that the facts are now to be determined by the jurors under the law as given them by the court, and the jury could not have been misled thereby. The statement of which defendant complains was clearly qualified and explained by the other instructions following. *Gray v. State,* 4 Okla. Cr. 292, 111 Pac. 825, 32 L. R. A. (N. S.) 142.

Instruction No. 10 defined the law as to the right of the aggressor in a difficulty to claim self-defense.

Instruction No. 11 was on the subject of premeditated design, and No. 12 was on the same subject, as applied to the evidence in this case. Instruction No. 13 was upon the subject of apparent danger to the defendant from an attack upon him by the deceased and his right of self-defense. These, together with other instructions, fairly covered every phase and theory of both parties, as disclosed by the evidence.

Defendant insists, that instructions Nos. 15 and 20 were prejudicial because there was no testimony to justify the giving of such instructions, and that they suggested to the jury a state of facts not warranted by the evidence. These instructions are as follows:

"(15) The state of mind of the defendant at the time he invited the deceased out in front of Howard & Guthrie's store, if you believe he did invite him out there, is a material question for you to determine. If the defendant invited the deceased out of said store with the expectation that there would be trouble, and voluntarily entered into the difficulty armed with a deadly weapon, and the killing resulted after he so voluntarily entered into the difficulty, then the defendant would be guilty of murder; but, if at the said time he hoped and desired that there would be no trouble and went out with the deceased with no expectation of trouble and with no intention of using the weapon with which he was armed except only as a last resort to protect himself, and did not intend to voluntarily enter into the difficulty, and did not enter into it voluntarily, then the homicide would be justifiable, and it would be your duty to acquit the defendant, if you so believe he acted in his necessary self-defense."

"(20) You are instructed, however, that neither threats of themselves nor the bad reputation of the deceased, if such threats were made or if he had such re-

putation, will justify homicide in this case, if you believe from the evidence beyond a reasonable doubt that the defendant was the aggressor, or that he entered voluntarily into the conflict armed with a deadly weapon."

According to our view of this record, there was ample testimony calling for these instructions or instructions of like import. This record contains several hundred pages, and to demonstrate our conclusions in this regard by setting out in detail the testimony of the many witnesses supporting this view would serve no good purpose and would extend this opinion to an unnecessary length. Suffice it to say that scattered all through the record appear facts and circumstances calling for instructions upon the question of premeditation and as to whether or not the defendant voluntarily entered into the difficulty. The instructions, as a whole, under the testimony, were very favorable to the defendant. The giving of instruction No. 15, defining murder, was not prejudicial, since the verdict was for manslaughter, and the defendant cannot complain because the jury decided the lesser degree of homicide took place. The theory of the state that Fred Linn was a coconspirator and that the homicide was a premeditated murder was not adopted by the jury, as is shown by their verdict, and the evidence and instructions in support of that theory, even if erroneous, could do the defendant no harm.

Third. Finally, the defendant complains that the dying declarations of the deceased were admitted in evidence without a sufficient preliminary showing that the deceased knew that death was imminent, or that the statement of the deceased was in fact a dying declaration.

Mr. Overstreet, a school-teacher, testified that the night following the tragedy, at about 1 o'clock, the deceased said he did not believe he could live, that he could not live, and witness took down in writing what the deceased said with reference to how the tragedy occurred. At this time deceased seemed to be sound mentally. This written statement was not signed by the deceased, and the court would not permit it to be introduced as evidence, but the witness was permitted to testify orally as to what the deceased said at that time, as follows:

"He said that—Mr. Stinson said that Mr. Beason was a contentious man, and that he told him he never said anything to his wife that ought to have offended her or should, and he went on to state that they were at town and he was in the store at Guthrie & Howard's grocery store, and Doc Beason came in and told him he wanted to talk to him, and that Mr. Stinson told him that he was not feeling very well and he didn't want to go on the outside, that they could just talk in there; they was in the grocery store; and Mr. Beason insisted that they go out, and they went out, and on the outside of Guthrie and Howard's grocery store a few remarks passed, a few words, and he started back into the grocery store, Guthrie & Howard's grocery store, and about the time they was about to enter the door Mr. Beason struck him with his gun, and that was about the last he knew. Those are about the the things he said."

Dr. Willis, one of the attending physicians, testified in substance that after he had told deceased that he could not get well he heard deceased tell how it happened. He said that Doc ought not to have shot him, that Doc's stock had been over on his place, and that he had started to take them home and he met Mrs. Beason on the way, and he said Mrs. Beason bawled him out and some words passed, and he said that, while he did not say anything

particular out of the way, except one word, that she threatened him with Doc, and that he told her to send the black rascal over and he would settle with him or talk with him.  He said that he did not curse Mrs. Beason; that the next morning he met Doc in the grocery store, and they went out to talk the matter over, out in the door, in front, and had some words, and that Doc turned, and he thought started off, and he asked him something, and Doc turned around and went to hitting him over the head with his pistol.  The witness said that at this time the mental condition of the deceased was fair; that he had been in a sleepy condition from injections of morphine and woke up; that his eyes showed the effect of morphine.

Before this Dr. Lansden had testified that the deceased, in Dr. Willis' presence, three or four hours before he died, stated that he thought he would die.  For about two hours before he died he seemed to be in an unconscious condition.

The defendant objected to the dying statement as related by Dr. Willis because it did not purport to be all that the deceased said, and for the further reason that it was not shown that the deceased was mentally capable, at the time it was made, of making a correct statement, and moved that the statement be excluded from consideration by the jury.  This was by the court refused and an exception taken and allowed.  The evidence above recited amply justified the court in deciding that these declarations should go to the jury for their consideration. *Elliott v. State,* 18 Okla. Cr. —, 194 Pac. 267; *Morris v. State,* 6 Okla. Cr. 29, 115 Pac. 1030.

Touching this testimony, the court gave the following instruction:

'(21) Some evidence has been introduced in this case tending to show that the deceased a short time prior to his death made certain statements, after he had given up all hope of recovery and believed he would die, and, should you find that such statements were made, you should determine as to whether or not the deceased was correctly understood by the witnesses, and whether or not what the deceased said was correctly detailed by the witnesses, and, should you find and believe that they were so correctly understood and detailed, you should consider such facts so detailed, in connection with all the other evidence in the cause, bearing in mind that you are the exclusive judges of the credibility of the witnesses and the weight to be given to the statements detailed by them."

Defendant contends that the court did not submit to the jury the question of whether or not the deceased at the time made these statements, had abandoned all hope of recovery, but in effect told the jury that he "had given up all hope of recovery and believed he would die." We cannot agree that this instruction is susceptible of this interpretation. While this instruction might have been couched in different language, yet the expression "Some evidence has been introduced to show that the deceased, a short time prior to his death, made certain statements, after he had given up all hope of recovery," etc., imports that the truth of these statements and the hope of recovery were both for the jury to determine. *Hawkins v. U. S.,* 3 Okla. Cr. 651, 108 Pac. 561; *Willoughby v. Territory,* 16 Okla. 577, 86 Pac. 56, 8 Ann. Cas. 537.

Ordinarily, when a dying statement is offered in evidence, the court should require the necessary preliminary

proof of its admissibility in the absence of the jury, but where, as in this case, in the presence of the jury it was shown that the deceased had been informed by his physician, in the presence of other consulting physicians, that in their opinion his wounds were fatal, and that he had but a short time to live, and that the deceased himself had stated, in their presence, that he believed he would die, and there being testimony tending to show that deceased was rational, and no objections having been made to such testimony being heard in the presence of the jury, it was proper for the court to determine whether an explanatory declaration by the deceased as to how the difficulty occurred should be submitted to the jury for their consideration. *Elliott v. State,* 18 Okla. Cr. —, 194 Pac. 267; *Morris v. State,* 6 Okla. Cr. 29, 115 Pac. 1030.

We are impressed from this record as a whole that the deceased should consider himself fortunate that the verdict in this case was for manslaughter instead of for murder.

Finding no prejudicial error, the judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.