James Frank DAVIDSON, Plaintiff in
Error,

v.

The STATE of Oklahoma, Defendant in
Error.

No. A–12572.

Criminal Court of Appeals of Oklahoma.

Sept. 24, 1958.

608

Sam W. Moore, Forest N. Simon, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

The plaintiff in error, James Frank Davidson, hereinafter referred to as the defendant, was charged by information with larceny of an automobile, was tried before a jury, found guilty, and his punishment assessed at 10 years in the state penitentiary. The information upon which the defendant was tried contained the following substance as to the charge:

"That the Defendant, James Frank Davidson, on the 10th day of December, 1956, did wilfully, unlawfully, and feloniously, by stealth and fraud, and without the knowledge and consent of the owner thereof, take, steal, and drive away from the immediate possession and control of Jerry Cravens Motor Company, a 1957 Model Ford Four Door Sedan, bearing 1956 Oklahoma Dealer's License No. D–2510, Motor No. D7KG106389, and the personal property of the said Jerry Cravens Motor Company, the said

taking, stealing and driving away of said automobile by the defendant was with unlawful, wrongful, wilful and felonious intent to appropriate the same or the value thereof to his own use and benefit and to deprive the said rightful owner thereof; contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma."

A rather voluminous record is presented reflecting the testimony of more than a dozen witnesses. The lengthy brief of the defendant relates a thorough and accurate condensation of the testimony. The court has carefully reviewed the 350 page transcript and agrees with the Attorney General when he referred in his brief to defense's digest of the testimony as follows: "They (defense counsel) have incorporated in their brief one of the most complete and at the same time one of the fairest statements of the evidence we have seen in any brief."

Because of the numerous questions presented and the seriousness of some of the contentions, we deem it advisable to herein present the testimony as related by defendant's brief and agreed to by the Attorney General as an accurate and a fair statement of that out of which this case arose.

The defendant, from said conviction, appeals to this court and relies for relief upon 5 assignments of error as follows:

"A. The verdict of the jury was and is contrary to the law and the evidence in the case, in that there is failure of the evidence to connect defendant with the auto alleged in the information to have been stolen and that the state's proof as compared to the information constituted a variance.

"B. That the court erred in failing to instruct the jury on the question of possession of recently stolen property.

"C. That the court erred in failing to properly instruct the jury on the law of circumstantial evidence.

"D. The court erred in deciding questions of law, including the admissibility of certain evidence to which objections were made.

"E. That the punishment assessed by the jury is excessive and unreasonable, and was the result of passion and prejudice harbored by the jury during the trial."

The defendant bases this assignment of error (No. E) upon admissibility of evidence as to:

a. A threat to one witness by defendant prior to date.

b. Evidence by state witness that defendant was an Atheist.

c. Evidence of marital difficulty of the defendant with inference of another and separate crime.

Mr. W. W. Goeringer, Office Manager for Jerry Cravens Motor Company, was called as a witness for the state and testified that on the 10th day of December, 1956, a 1957 Ford, maroon and white, automobile, mtr. no. D7KG106389, with a "D" tag, D–2510, 1956, disappeared from the Jerry Cravens Motor Company "place of business;" that he knew James Frank Davidson; and that Davidson had worked for Jerry Cravens Motor Company for "a month or a little more;" and as follows, to-wit:

"Q. Let me ask you this, did you ever receive the title to the car back or was it ever turned over to you by anyone? A. Well, the title we had at the time the car disappeared."

Mr. Goeringer, on cross-examination, admitted that he had not seen the car the day it was allegedly stolen, and on direct examination said he did not see the car after it was allegedly stolen; and that there are about 1,000 different keys to fit Ford automobiles; and on cross examination the witness admitted that all he knew about the car's being taken was what somebody else had told him. This witness stated that he reported the taking to the police or the highway patrol the next morning, December 11, 1956; and he fur-

ther stated that it would be possible that 1956 and 1957 Ford keys would have the same cuttings.

Mr. William Keaton, a salesman at Jerry Cravens Motor Company who was so employed December 10, 1956, next testified for the state. This witness testified about a blue and white Ford, 1957 model. This witness testified about how he parked the car and left it and later discovered the car missing. He stated that he was not too alarmed, "due to the fact that occasionally on company owned cars like that any of the rest of the employees there do have the privilege of driving them." The witness testified that the car was a company demonstrator. After checking, the witness reported the car as stolen to the police about "8:00 o'clock, 8:00 or 8:30, somewhere along there on the night of the 10th of December." The witness stated that he saw the car about the first of the year demolished and that he identified it by the motor number, but later he admitted that it was the serial number that he checked on the car and that he did not remember what the serial number was; the witness stated that he had known Frank Davidson casually when he had worked for Jerry Cravens around the first of the year but that he had not seen him around the place on December 10; the witness further testified that to his knowledge there "was not a title issued by the State of Oklahoma to a demonstrator, or to this particular car," and that the car "would have had to have been in Jerry Cravens' name because he was the sole owner of it." On cross-examination, the witness admitted that the defendant had worked, not at the "place on 6th street" from which the car was allegedly stolen, but at the used car lot on 36th and May.

The next witness called by the state was W. W. Harrison, an employee of the Oklahoma City Police Department for 9 years, the last four of which was in the Stolen Car Division; he testified that he began an investigation of the loss of an automobile from Jerry Cravens Motor Company on December 10, 1956, about 10:50 a. m. on the morning of December 31, 1956, and that at about 1:30 p. m. "we arrested the defendant James Davidson," Olive Lorraine Hawkins, a boy by the name of Clark and his wife and a third man who was released; that when asked about the new Ford, Davidson denied any knowledge of a new Ford, but admitted he had been involved in an accident; that upon searching Davidson at the police station he found "personal property, a billfold, keys, and one new Ford key" and some motel matches; and that the witness had never coerced or threatened the defendant to try to get him to make any statement. On cross examination state's witness, Harrison, testified that he searched the Mercury automobile owned by Clark, one of those arrested with Davidson, which was at the scene of the arrest, and that he found two television sets and some personal clothing and a fifth of whiskey "with about that much left in it." The witness further stated that a man by the name of W. C. Rogers and his wife had already been taken into custody on the day of the arrest—that they were arrested about 11:00 o'clock a. m. There was testimony from this witness that at the time of the arrest there was a state-wide pickup on a '53 Buick concerning an attempted robbery of a bank in Pauls Valley. In response to the following question on redirect examination, "I want to know what he told you and what the other people told you in his presence," the witness answered in part as follows: "And he said, 'Yes, we were involved in an accident,' and other than that he refused to answer my questions because he was in a drunken condition and had been drinking," to which answer (in part) objection was taken, sustained and the jury admonished by the Court not to consider it.

Paul W. Clark was then called by the state as a witness, and he testified that he was a trooper in the Oklahoma Highway Patrol stationed in Marietta, Oklahoma, on the 31st of December without giving the year; that he had on that date investigated a one-car collision involving a 1957 Ford; that no one involved in the accident

was present when he arrived at the scene of the accident; that he made an investigation; that the accident was 6.7 miles south of Marietta on U.S. 77; that he checked the license tag which he said was "11–2525, I believe." The witness then testified to the fact that the tag was stolen off of an Oldsmobile in Norman, and that upon receipt of that information he checked the motor number of the wrecked car and that from the radio report it had been stolen in Oklahoma City on the 10th of December; and the witness testified that the motor number of the wrecked car was D7KG106389.

Upon cross examination this witness testified that motor numbers are no longer cut with a die on the motor block of this model Ford, and that the number he had given was, in fact, a serial number. He testified that these cars no longer have motor numbers, and went on to describe the condition in which he found the car—wrecked—and how he determined that it happened; that he found some pictures and some keys in the car, specifically a key to the Alamo Plaza Courts and some miscellaneous keys apparently to doors, which he turned over to "the courts here in Oklahoma City," and he testified also that he found a medicine bottle. It was then stipulated by the state that the medicine bottle contained some unknown medicine and was labeled under the name of W. C. Rogers; that the bottle of medicine, according to the label was bought in Irving, Texas, and that it had no prescription on it. It was also stipulated that the key referred to by the witness checked out as an Alamo Plaza key to Olive Hawkins and Mr. and Mrs. Joseph Clark.

V. E. Moncrief, who testified that he had been on the Police Department for twenty one years and the last eleven in Auto Theft Division, was next called by the state as a witness. He testified that he was working in that capacity January 1, 1957. This witness testified that he talked to defendant Davidson in the police department, room 208, about 9 o'clock a. m. January 1; and that during the conversation the defendant had admitted stealing "the car" and further that the defendant admitted taking the car from Jerry Cravens Motor Company; that the keys were in the car when it was taken and that he took it along late in the afternoon. The witness further stated that he had taken the car to Wayne to his father's home, after having disposed of the dealer's license plate in a canyon somewhere near Oklahoma City; that the witness spoke freely, and that no coercion or force or anything at all was used to make him talk. The witness testified that an ignition key, which had been turned over to him by the arresting officers, worked in the car when it had been brought up from Marietta, and that when asked if the key was the one to the Ford, defendant had said that it was; and that the witness did not take a written statement from the defendant. About two weeks later, the witness tried the ignition key in the Ford and it worked.

Olive Lorraine Hawkins was called by the state as a witness; she testified that she knew the defendant and had known him "since last June, about a year ago,"; that she had gone with him socially; that she was in Dallas working as a buyer in linens on December 10, 1956; that she received two collect calls from Oklahoma City from "Mr. Davidson" on that date, the first one before noon, that she recognized his voice "on the long distance telephone call" (reference being to the one before noon); that Defendant wanted the witness to send him some money to get his car (a 1956 Ford) out of a garage; that she sent him $40; that she received another call the same day in the middle of the afternoon sometime and she recognized Mr. Davidson's voice at that time; that Davidson wanted, and witness wired him, some more money; that she saw Davidson the next morning about 3:00 o'clock a. m. in her apartment in Dallas and that she knew he had driven a new car there; and that it was a 1957 Ford; that defendant said "he took it", but other than in Oklahoma City he did not tell her where; that defendant had called a Sonny Rogers

on her phone about 7:00 o'clock the next morning and told him that he had a new car; and that "he took a new car" but the witness did not remember that he had said where to Rogers; that Rogers came over about 8:00 or 8:30 and they both saw the car for the first time; that after 4:30 p. m. of that day the witness flew to Oklahoma City to get Davidson's car out of Fred Jones' garage, paid $34 or $38 and got it out, and drove it to Wayne and met the defendant there; that "this new 1957 Ford car" was discussed at that time and defendant told his mother and father that the witness had given him the car for Christmas; that witness had returned to Dallas and Davidson followed about two days later and witness tried to get defendant to get rid of the car; that defendant never did tell witness any particular place in Oklahoma City where he stole the car; that on December 31st, 1956, the witness was involved in an accident in Marietta, Oklahoma, and was injured; that at the time of the accident "we were in the 1957 Ford, and he was driving"; that "Jimmy at all times" claimed that this was his car; that the accident occurred when "we were going 115 miles an hour and at that time the car started turning"; that they were taken to Ardmore and from there they hitched a ride to Wayne where witness and the Clarks got into the Clark Mercury and went to Oklahoma City while Jimmy stayed with the one from whom they had hitched a ride; that she had the medicine bottle previously referred to in her purse which was given her by Sonny Rogers' wife; and she identified some pictures as being that of her children which she had lost in the car at the time of the wreck. On cross-examination the witness described how she had been introduced to defendant at the Television Bar in Dallas by a mutual friend, Jack Pierce, whom she had known for perhaps a year and a half; that on the 11th of December, 1956, she had been able to get Davidson's car out of Fred Jones' garage after it was closed without giving her name and without saying she was Davidson's wife; that when she went to Wayne that

night she did not know that Davidson would be there; she testified that Davidson had been to her apartment many times before the night he arrived with the car; that after she stopped in Wayne on the night of the 11th of December, defendant's mother talked her into sleeping there a part of the night and she drove back to Dallas the next morning without Jimmy; and that a couple of days later the defendant drove to Dallas and stayed about a week in the witness' apartment; that she had come to Oklahoma City with Mr. and Mrs. Clark and Mr. and Mrs. Rogers but was not registered in the Alamo Plaza Courts, some time prior to December 31st, and that she had come up to see "Jimmy over the weekend" and that he was in Wayne; that they arrived in Oklahoma City on Saturday night and were arrested on "Monday, Monday morning"; that they—the Clarks, and the witness—left Oklahoma City real early Monday morning and drove to Wayne in Clark's Mercury where they got out and into Jimmy's car; that the Clark Mercury was the same one with televisions stored in it which had been stolen from the Alamo Plaza but that the witness did not know there was stolen merchandise in the car; that the witness had come to Oklahoma City the weekend before Christmas, Christmas day and again on New Years and on each occasion with the Clarks in the Mercury; that she had met the Clarks through Jimmy who had been in the Navy with Sonny Rogers who was Mrs. Clark's brother. The witness stated she had seen Rogers on the morning of December 31, 1956 at the Alamo Plaza Courts just before she and the Clarks started for Wayne; that the witness had been in the hospital about four weeks, then lived with her sister in Norman "until ten weeks ago, and I have been in jail since then" in Oklahoma City and Norman. The witness stated that she at one time had stated to Mr. Saied (The assistant county attorney who prosecuted the trial of this case) that she did not know and that she was so tight that she didn't know who was driving the car when it was wrecked; that the witness was

pretty tight and all of them had been on a drinking spree; that the witness admitted that she had consumed a lot of whiskey, that she and the Clarks had stopped and got some whiskey on the way to Wayne and that they had some beer in Wayne when Mr. and Mrs. Clark ate breakfast, but denied that she was an alcoholic. Counsel for defendant at the trial asked this witness "have you been charged ·or filed on in any court that you know of in connection with this car deal?" and "are you in any way charged, that you know of, with participation in this car theft?" to both of which questions objections were entered and sustained by the Court; the witness stated that the reason she at one time said that she did not know who was driving. the car was that she didn't want to say anything to hurt Jimmy and the reason she now testified as she has was "a son I have has written me and begged me to tell the truth" and "to save my own self-respect and to keep the trust and faith that he had in me * * *" and the witness denied that any one had made her any promise of anything to tell her story as she had related it. The witness stated on redirect examination that she was being held as a material witness in the case during the time she had been in jail "for about several weeks." The witness was then, on redirect examination, asked the following question, "Now, you were a little hesitant the first time I talked to you and I would like to ask you if you had ever been threatened by this defendant if you testified or went to the police about anything that he may do?" to which the witness answered, "Yes, sir," and then related how defendant allegedly came in her apartment with a gun and shot some things and turned the gun on her and said that if she ever went to the police in connection with anything that she knew he would shoot her; and then the following occurred, to-wit:

"Q. Now, are you still afraid of this defendant? A. No.

"Q. Why aren't you? A. Well, a little bit, yes."

On re-cross examination it was revealed that the alleged threat occurred in Dallas, Texas, in November of 1956 and that she had been with defendant socially since their arrest on this case and no additional threat had been made. Defendant's motion to strike the testimony concerning the threat and that the jury be admonished to disregard it was overruled by the court.

Dorothy Holley of Norman, Oklahoma, who stated that she had known James Frank Davidson since January 4th, the Friday after the carwreck, was next called as a state's witness. The witness testified that she was the sister of Olive Hawkins; that she had met Mr. Davidson in the Black Hotel when she went to lunch with her sister; that she had seen Davidson on five or six occasions since that date; that he had been in her home once in February and on the 22nd and 24th of March. The witness in response to a question to relate the conversation between defendant and herself volunteered that "Jimmy stated that he was an Atheist * * *" and "then he made the remark a few minutes later that the only thing wrong with stealing is getting caught"; and then in the alleged conversation witness testified that she told Davidson what she thought was wrong with stealing and said, "Of course, when you steal something from a company, like your stealing that car in the City," then quoted Davidson as saying, "You mean taking that car," and then quoted Davidson as admitting the theft in response to a question asking if he did steal it as, "Sure, but nobody can prove it." Then the witness referred to conversation by her sister, Olive Hawkins, in the presence of defendant, concerning the difference between saying "taking" and "stealing." On cross-examination the witness was asked, "referring either to March 22, or March 24, the Sunday after Friday the 22nd, "Now at that time, it is a fact, is it not, that your sister had been in jail and was out on bond out of the Justice Court of Wendell Foster?" and the further question, "Well, you knew that your sister had been arrested?" and ob-

jections were entered as to both questions and by the Court sustained. Defendant made an offer of proof, thereupon, in the following language, to-wit:

"Comes now the Defendant by his counsel and offers to show that the sister of this witness at the time she is testifying about was under a criminal charge duly filed in the Justice Court of Wendell Foster and that she was charged under said charge jointly with Joseph C. Clark, Mildred Clark, and the defendant here, James Davidson, and that at that time the sister of the witness was out on bond, which case had not at that time been disposed of in the Justice Court of Wendell Foster, and that the witness knew of the facts and, further, we offer to prove that the record of whatever proceedings was had in the Justice Court of Wendell Foster is now contained in the file in the District Court, filed in Case No. 24203."

In response to a question concerning a date, the witness volunteered a statement that on the occasion of defendant's visit he had pulled a rug out from under her and injured her back and she missed work a week.

Upon recalling Olive Hawkins for further cross-examination, defendant's trial counsel again tried to get an answer to the question of whether or not she, the said Olive Hawkins, defendant here, and the Clarks were jointly filed on subsequent to their arrest on December 31, 1956, to which objection was entered and by the Court sustained, and counsel made an offer to prove by the witness that the defendant, the Clarks, and she were jointly filed on for a felony in the Justice Court of Paul Powers and held under bond to answer the charges.

At this point the state rested its case and the defendant entered a demur to the evidence and a prayer for a directed verdict of not guilty based upon the insufficiency of the evidence to support a charge of larceny of an automobile as charged in the information, and the demur and prayer were, by the court, overruled.

The defendant then called Rolland Hammond to the stand as a witness and he testified in substance that he had known the defendant about seven years, that in September, October and a part of November, 1956, defendant had worked as a part of his crew selling encyclopedias; that defendant quit in November; that he had seen defendant on Monday, December 10, in Wayne at his house; that the witness got out of school in the city at 12:30 and drove directly to Wayne on the afternoon of December 10th; that when he saw the defendant he said he didn't have a car and he wanted to know if witness would drive him to Oklahoma City to get a money order; that he did take him to Oklahoma City where defendant picked up the money order and they returned immediately to Wayne stopping at a customer's house in Norman and upon arrival in Wayne both went by some of defendant's friends to try to sell some encyclopedias; that he stayed with defendant in Wayne until about 8:00 or 8:30 that night.

Mrs. Sue Davidson, mother of the defendant, was next called as a witness for the defendant. Mrs. Davidson testified that the defendant was in her home on the 10th of December and that he was at her home in Wayne, Oklahoma, at about 2:00 or 3:00 o'clock, she and her husband having been away from home the forepart of the day; that defendant stayed there three or four days and he had no kind of a car with him; that on the 10th or 11th of December, 1956, Olive Hawkins came down by Mrs. Davidson's house in Wayne in a 1956 Ford at night and she had been drinking and left about 2:00 or 3:00 o'clock in the morning; that while Olive Hawkins was there Jimmy had no automobile on the premises.

Jack James Pierce was then called by the defense, and testified that he knew Olive Hawkins, and that he had introduced Olive Hawkins to the defendant Davidson; the witness testified that he knows Olive Hawkins' sister, Dorothy Holley, had met

her in her home in Norman, Oklahoma, upon Davidson's invitation; that he was there on a Friday after the first of the year; that they had all gone to a tavern until midnight and he could not remember any conversation about eating meat on Friday, but when the tavern closed they all returned to the apartment; that there was no discussion had or statements made concerning a stolen automobile; that all of those present were drinking excessively—whiskey and beer and that nothing was said in his presence about a stolen car.

The defendant, James Frank Davidson, was then called as a witness by the defense, testified that he had worked for Jerry Cravens here in Oklahoma City, at 36th and May about a month and a half, maybe two months in the early part of 1956; that he had gone to the office at 6th street once; that he was unemployed immediately prior to December 10, 1956; that he stayed during part of that time with Olive Hawkins in Dallas, Texas, and part of the time at his mother's at Wayne; that he was selling shoes in Dallas when Jack Pierce had introduced him to Olive Hawkins in June of 1956; that defendant moved in with Olive Hawkins at her request while she was working in Dallas as a linen buyer and that Olive Hawkins' son, Jack, lived with them in the apartment; that he had a blue and white 1956 Ford at all times he was with Olive Hawkins in Dallas; that the defendant was at Ray's Cafe, downtown Oklahoma City on the early morning of December 10, 1956; that he had just put his 1956 Ford in Fred Jones' garage by having them pick it up with a wrecker; that on the morning he had called Olive Hawkins to wire him some money from Dallas; that he picked up the money order Miss Hawkins had wired; and that he did not have to have identification to pick it up at the Western Union office; and that after picking up the money on the morning of the 10th of December, he went to Wayne, Oklahoma; that he called Olive Hawkins for some more money from the bus station with which to get his car out of the garage; that he went to

Wayne on the bus and went to his mother's and dad's house; that no one was home when he arrived but later his mother and dad came and then later Ronnie Hammond came by in his car; and Davidson asked Ronnie Hammond to drive him back to Oklahoma City, and he did; that they went to the Western Union at 3rd and Broadway where he went in and cashed the money order, which seemed less than he had expected and they both returned to Wayne, Oklahoma, stopping several places on the way; that it was dark before Hammond left Wayne to return to the City; that defendant did not go to Dallas that night and he slept in Wayne all night and was in Wayne, Oklahoma, December 11; that Olive Hawkins came by his mother's house either during the night of the 11th or the early morning of the 12th, driving defendant's 1956 blue and white Ford; that defendant was in bed when Miss Hawkins arrived and Mrs. Davidson let her in the house; that Mrs. Davidson tried to sober Miss Hawkins up by having her drink some black coffee; that she left in the blue and white 1956 Ford and that defendant did not have a blue and white 1957 Ford at that time; that he saw Miss Hawkins next about the 14th or 15th of December, in Dallas, having flown there from Oklahoma City; and they stayed together for a few days drinking pretty heavily and both returned to Oklahoma City around the 20th or 21st in the blue and white 1956 Ford with Miss Hawkins driving and she stayed in Oklahoma City a couple of days and nights with defendant, after which defendant went to Wayne, Oklahoma, and Miss Hawkins returned by plane to Dallas; defendant turned the 1956 blue and white Ford over to his attorney to turn it over to an insurance company; that he next saw Olive Hawkins between Christmas and New Year's in Dallas, Texas, where he flew, stayed a day or a day and half, and both flew back; that he went to Wayne, Oklahoma, riding a bus from Oklahoma City; that he next saw Olive Hawkins December 31st when she and Joe Clark and his wife

came by his house in Wayne in a '56 black and white Mercury; that they were all drunk and arguing about who was going to drive; that defendant drove to a "closed down" service station in Wayne, Oklahoma, being directed by Joe Clark, where Clark wanted to pick up a blue and white 1957 Ford and leave the Mercury because of engine trouble; that defendant believed he had seen the car before in the possession of Gladys Simms in Dallas and later in possession of the Simms girl and W. C. Rogers whom defendant had been in the Navy with; defendant had met the Clarks through W. C. Rogers who was the brother of Mrs. Clark; that when Clark directed defendant in the Mercury to the Ford, defendant did not immediately recognize it; that defendant then drove in the Ford and they had an accident; "down below Marietta;" that no one was hurt in the accident though Olive had a cut on her arm; that they all returned by hitching a couple of rides to Wayne, via Ardmore, where Olive Hawkins and the Clarks got into the Mercury and went on to Oklahoma City in it while defendant stayed in the car of Bobby Howard who had picked them up in Ardmore; that both cars stopped at the Alamo Plaza Restaurant, that the other folks had said that they were registered at the Alamo Plaza Courts; that they were then arrested and discovered that the Rogers had already been arrested; that when he was arrested the officers said for a stolen automobile, and he said, "Well, that is impossible. Let me call my attorney," and the two stolen TV sets were discovered in the trunk of the Clark's Mercury, which had been stolen from the Alamo Plaza Motel and defendant was charged with stealing the television sets along with the others; that the only thing defendant said was that he wanted to talk with his attorney, and that at the time of his arrest was the first time he understood that the car was stolen; defendant and the others were arrested and taken to jail and questioned about a bank robbery at Pauls Valley and about the car that was wrecked "down there," and something was mentioned about a rape case;

that defendant was questioned by Officer Moncrief about three times in somebody's office; that Officer Moncrief said to defendant that they were "going to hang you regardless" and stick him with the TV thefts, too; that he at no time told the officer that he had stolen the automobile out of the alley; and that defendant was filed on for theft of the TV sets along with Joe Clark, his wife and Olive Hawkins which charge was dismissed against defendant when Clark pleaded guilty to the theft of the TV sets; that defendant was held in the City jail a couple of days in investigation until he had smuggled a message out to his attorney through the grapevine at the jail house, and then bond was arranged and defendant was moved to the county jail and charged with theft of the automobile and the television sets, and defendant subsequently made bond on both charges and then he saw Olive Hawkins next about the 7th or 8th of January in Dallas, Texas; Hawkins had made bond, too, and was in the Baylor Hospital; that he visited her in Norman, Oklahoma, after her return from Dallas, and after she visited him in the Rex Hotel in Oklahoma City where she stayed for ¾ of a night before she went to Norman; that he had never had any conversation with Olive Hawkins' sister, Mrs. Holley, about a stolen car; that they had partied and there had been no conversation about a stolen car; after the two visits to Norman to see Olive Hawkins, defendant saw her for approximately 45 minutes in Ray's Cafe in Oklahoma City and the next time in the county jail when he had gone to visit her where she was being held as a material witness on this case against the defendant; that he was not on or about the premises of Jerry Cravens Motor Company at anytime December 10, 1956; that he did not take, steal and drive away a 1957 Ford automobile.

On cross-examination defendant was questioned concerning his marital status in the following manner, to-wit:

"Q. Are you married, James? A. Yes, sir.

"Q. Who is your wife?. A. I am currently getting a divorce.

"Q. When did you get married? A. December 20th. It was five years ago, I believe it was December 20th.

"Q. Did you also marry on April 10th, 1957?"

Defense counsel objected as improper and highly prejudicial, and the Court overruled the objection and directed the questioning to proceed; and it was developed that the defendant had gone through "part of a ceremony" but that they did not live together as man and wife in Edmond, Oklahoma; then defendant was questioned regarding his feelings towards officers.

After defense rested, the state called as a rebuttal witness Mr. Charles H. Nesbitt, office manager of Western Union Telegraph Company, who testified that he was such office manager December 10, 1956; that he had control and in his possession the files and the documents which are filed in his office; that he received two telegrams from one Olive Hawkins at Dallas, Texas, addressed to James Frank Davidson or James Davidson.

The witness identified a telegram or money order for $65 payable to James Davidson and stated it was received at the main office at 3:45 p. m. and payment was made at their counter at 3:56 p. m. on December 10th. The sender had included a question to be asked the payee as additional identification, which question according to his records was "O.K."

The defendant in his first contention, questions the sufficiency of the testimony to connect him with the auto alleged in the information to have been stolen, and described as a 1957 Ford 4 door sedan, bearing 1956 Oklahoma dealers license No. D–2510, motor number D7KG106389. Defendant bases this argument largely upon the failure of the state to describe the vehicle stolen as it was set out in the information and because the state's proof as to motor number was in reality a serial number; the information alleging the motor number to be D7KG106389 when

the testimony of the state showed it to be a serial number. Also confusion was generated by witness Goeringer describing the car taken from the Jerry Cravens lot as a 1957 maroon and white Ford when all others referred to it as a blue and white 1957 Ford. Further, defendant contends that the state failed to prove the allegation of the information as to it being a 4 door sedan. Upon first reading of the record and the excellent brief of defense counsel, it appears this contention is not without merit. But a thorough digest of the testimony and the chronological order of the course of events, as presented thereby, leads your writer to believe that to so hold would be spinning a fine web of technicalities to pervert justice. The witness established by their testimony that a 1957 Ford, motor or serial number D7KG106389 was taken from the Jerry Cravens lot late in the evening of December 10, 1956. Goeringer testified that it was maroon and white. Witness Keaton testified it was blue and white, but both were in accord as to the model, make, serial number and dealer's tag.

A 1957 Ford was involved in a collision on December 31, 1956, bearing a stolen tag and the serial number was D7KG106389, the same as the car taken from the Cravens lot on December 10, 1956. Witness Harrison testified he had occasion to investigate the loss of an automobile from Jerry Cravens Motor Company on December 10, 1956. That he was notified that a stolen car had been recovered wrecked, down by Marietta on December 31st, and about 1:30 p. m. arrested defendant, and in the process of searching him, found a new Ford key. Officer Moncrief testified that on December 31 he came into the investigation of the theft of an auto which occurred at the Jerry Cravens Motor Company, after receiving a report that the car had been wrecked south of Marietta. That he talked to the defendant on the morning of January 1, 1957, at the police station in the presence of two other officers; that he asked defendant who was driving the car at the time it was wrecked south of Mari-

etta, and he told the officer that he was, and upon being asked if he stole the car, defendant answered he stole it from behind Jerry Cravens Motor Company lot in the afternoon; he took it to the edge of town, disposed of the dealer's tag and replaced it with a stolen tag. Witness further testified that the arresting officer turned over to him a Ford ignition key, and defendant told him it was the key to the stolen car and when the car was brought up from Marietta that he tried the key and it worked the ignition.

Witness Hawkins testified defendant drove a new 1957 Ford to her apartment about 3 a. m. on the morning of December 11 and said car was being driven by the defendant at the time of the accident at Marietta.

█ Trooper Clark stated he investigated a one car collision involving a 1957 Ford; that the license tag was stolen off an Oldsmobile in Norman, Oklahoma, and that the motor number was no longer cut with dies on the engine but the serial number on the left door post was number D7KG106389; that the number was radioed to headquarters and it came back checked to a car that was stolen in Oklahoma City on December 10th. The defendant admitted driving a blue and white Ford 1957 model, at the time of the collision south of Marietta. It is to be noted that the preponderance of the evidence establishes the description of the car as a 1957 blue and white Ford. The information alleges a motor number. The evidence is conclusive that motor numbers are no longer used, but instead of serial numbers are imprinted on a metal tag on the door post. The change to this method had been recently made by auto manufacturers. It is quite evident that the information had recited the number used in lieu of a motor number. The proof showed that all testimony relative to motor number was actually intended to mean serial number. Thus, it was established that the serial number was the same as the number alleged in the information. The only description related

in the information not proven was that of the tag which was described as a 1956 Oklahoma dealers license No. D–2510. The defendant admitted that he removed and disposed of the tag from the car shortly after it was taken. Also the information describes the car further as a four door sedan. There was no proof as to this. The county attorney at no time asked any witness whether or not the auto was a four door sedan; however, neither did the defense counsel. Had he been serious as to this contention it could easily have been solved by propounding the proper question. Though it is not his duty to prove the allegations, he should not be permitted to benefit by lack of interest in what the answer would have been.

█ This court feels that the allegations of the information were sufficiently proven to justify the verdict. Butler v. State, 60 Okl.Cr. 188, 193, 62 P.2d 662. Closely related with this assignment is defendant's contention that in the allegations of the information and the proof there is a material variance, with this we cannot agree. That which constitutes a variance in a criminal case is well set out in defendant's brief and is recited in Hatley v. State, 72 Okl.Cr. 69, 113 P.2d 396, 397, where it is said:

"A variance in a criminal case is an essential difference between the accusation and the proof. A variance is not material unless it is such as might mislead the defense or expose a defendant to being twice put in jeopardy for the same offense."

In the case of Sykes v. State, 96 Okl.Cr. 9, 246 P.2d 379, 382, as a harbinger to applying the above announced rule, the court asked itself the following question:

Applying the test (supra) was the variance material? In other words, was defendant misled by the information in preparing his defense? If so, how was he mislead. Could the variance expose the defendant to being put twice in jeopardy for the same offense?

In the instant case, a negative reply to these answers are apparent, surely, calling a serial number a motor number would not so mislead the defendant as to prejudice him in any manner which this court can imagine. Neither would it appear likely that the defendant would ever again, be tried for the theft of a 1957 blue and white Ford, bearing a serial number D7KG106389, taken from the Jerry Cravens Motor Company, 113 NW 6th in Oklahoma City on December 10, 1956, and 21 days later found wrecked near Marietta, Oklahoma. The facts were established by the evidence and it would be preposterous to assume defendant could be twice put in jeopardy by being subsequently tried on this set of facts. In spite of the fact, this description was not proven as well as should have been. It is apparent from the record that a more thorough examination of the witness by the state, as to description, would have, no doubt, averted this contention. However, the variance in the allegation and the proof is by no means considered by this court to be fatal.

■ The next assignment of error is based upon defendant's assertion that the state failed to offer proof that the auto was taken without the consent of the owner. The record reveals that the county attorney failed to ask the direct question as to whether the auto was taken without the consent of the owner. It is to be deducted from the record that the car was in the possession of the Jerry Cravens Motor Company as a demonstrator and was for sale by said company. Evidence by the office manager of the company revealed the title to be in the name of Jerry Cravens. Jerry Cravens did not testify at the trial. The testimony reflects that a salesman for the Jerry Cravens Motor Company had negotiated a sale of the auto in question; that the salesman placed it in the service department for a check prior to delivery to the purchaser. Employee of the service department had parked the vehicle behind the garage about 4 p. m. and the salesman, a Mr. Keaton, went back to get the car about 4:45 to 5:00 p. m. and the car was gone. After checking with the employees, Mr. Keaton reported the car missing to the Oklahoma City police at about 8:00 p. m.

Mr. Goeringer also testified that he was the office manager of the Jerry Cravens Motor Company and reported the car missing to the insurance company and also to the police, the following morning.

■ After a careful review of the testimony it must be concluded that the Jerry Cravens Motor Company had exclusive possession of the vehicle alleged to have been stolen. It was said by this court in Hilyard v. State, 90 Okl.Cr. 435, 214 P.2d 953, 954, 28 A.L.R.2d 961 that:

"The actual status of the legal title to stolen property is no concern to the thief; so far as he is concerned, one may be taken as the owner who is in possession of the property and whose possession was unlawfully disturbed by the taking."

Also, see Cordonnier v. State, 86 Okl.Cr. 291, 192 P.2d 298; Hunsaker v. State, 81 Okl.Cr. 321, 164 P.2d 404; Little v. State, 21 Okl.Cr. 1, 204 P. 305.

■■ Also this court has held in numerous cases that in larceny prosecution, want of consent of the owner may be proved by circumstantial evidence. See Hall v. State, Okl.Cr., 312 P.2d 981; Fuller v. State, 70 Okl.Cr. 408, 106 P.2d 832; Coffey v. State, 29 Okl.Cr. 168, 232 P. 968, 969; Devore v. State, 33 Okl.Cr. 403, 243 P. 999. In the Coffey case, supra, it was said:

"In larceny prosecutions the owner of the property ordinarily must be called as a witness to prove the nonconsent to the taking of the property. It is held, however, that where circumstantial evidence shows an absolute want of consent to the taking, it will not be cause for reversal that the want of consent was not proved by the direct and positive testimony of the owner, although he may have been a witness in the case. And there is authority to the effect that the nonconsent of the owner is simply one of the elements of larceny to be proved by the

same means and in the same manner as the other elements must be proved."

And in State v. Wong Quong, 27 Wash. 93, 67 P. 355, the court said:

"The question of the sufficiency of such circumstances to establish the fact is usually one for the jury, and not for the court. It will not do to say that it can be proven only by the owner. The public have an interest in seeing that the guilty are punished, and this rule would permit the escape of all at whose trial the state was unable to procure the attendance of such owner."

It was further established in Jackson v. State, 10 Okl.Cr. 525, 139 P. 324, 326:

"In many, and perhaps most, cases, to support a conviction, direct proof that the property was feloniously taken from the person named in the indictment as owner is necessary. Yet it is not essential in all cases that there should be any direct evidence upon this point.

"The application of the rule must always depend upon the facts of the case. Appellate courts should carefully consider and guard against so construing the law that a proper rule of evidence would be perverted into a means of escape from the merited punishment of an offender. Circumstantial evidence may be resorted to for the purpose of proving the corpus delicti in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense."

■ It is to be noted that the office manager of the Cravens Motor Company reported the car missing to the insurance company and police, the following morning, thus causing search to be made. He testified he reported it to the insurance company because they had to report all accidents and thefts to the insurance company. This court recited the rule in a very early case, Campbell, George v. U. S., 1 Okl.Cr. 307, 97 P. 1052:

"The fact of nonconsent to the taking may be proven by facts and circumstances which sufficiently show that the property was feloniously taken, and the fact that the owner caused search to be made for stolen property is a cogent circumstance to show want of consent."

■ This court reaffirmed this adopted rule in the case of Kilpatrick v. State, 90 Okl.Cr. 276, 213 P.2d 584, 585:

"In prosecution for larceny, it is not necessary that the complaining witness expressly testified the property alleged to have been stolen was taken without his knowledge or consent. It is sufficient if he relates the circumstances from which the lack of consent may reasonably be inferred."

The testimony clearly shows that the Jerry Cravens Motor Company had exclusive possession of the auto and were in the process of selling it to a customer. That a few minutes later it was missing from the lot. An inquiry was made of all employees and then it was reported to the police and to the insurance company. These acts certainly created a strong circumstance that consent had not been given. This coupled with the testimony of Officer Moncrief that defendant admitted stealing the car from Jerry Cravens Motor Company as alleged, was sufficient to show a felonious taking and this assignment of error does not prevail.

■ Defendant further contends that the court erred in failing to give an instruction on the effect of defendant's possession of recently stolen property. We have reviewed the court's instructions and agree with defendant in that no instruction was given to cover this phase of the testimony. Also, we note that no request was made by defense counsel for such an instruction, nor were exceptions noted to the instructions given. The question herein presented is whether or not the court is required to give such an instruction in the absence of a request by defense counsel. We find no universal rule applicable on

such a question and each case must be governed upon the facts therein. This court is cognizant of the general rule that it is the profound duty of the trial court to instruct the jury on all the material issues of law. See Bradley v. State, 63 Okl.Cr. 203, 74 P.2d 126; Palmer v. State, 78 Okl. Cr. 220, 146 P.2d 592; Takarske v. State, 81 Okl.Cr. 189, 162 P.2d 197; Miles v. State, 41 Okl.Cr. 283, 273 P. 284. So it must be decided in each case whether or not the question of possession of recently stolen property is of such materiality as to render it fundamental. The general rule has been stated by this court time and time again that if defendant is not satisfied with the court's instructions to the jury it is his duty to request what he considers to be the proper instructions; and unless the request is made this court will not deem the failure of the trial court to give an instruction reversible, unless it is of such fundamental nature as to deny the defendant a fair and impartial trial. In the case at bar, there was no request made for such an instruction. The defendant was not found in exclusive possession of the car, but testified he was driving the auto at the time it was involved in a wreck some 21 days after the car was reported missing. According to defendant's testimony, he was not in the exclusive possession of the auto, but was merely driving the auto at the time of the wreck while in the company of other persons, one of whom had custody of the car according to defendant's testimony, and that defendant drove because the others were drinking.

There was testimony that defendant was in possession of the car shortly after the theft. This the defendant denied. The testimony related that defendant admitted stealing the auto as alleged. However, the defendant denied making this admission. Evidently the jury did not believe him. In view of the fact that there was both circumstantial and direct evidence pointing to defendant's guilt, we cannot believe that the court erred in failing to give such an instruction in the absence of a request. This court said in discussing this

very question in the case of Cordonnier v. State, 86 Okl.Cr. 291, 296, 192 P.2d 298, 300:

"We again point out that where counsel representing one accused of crime is not satisfied with instructions which are given, it is their duty to request a proper instruction. Counsel who represents the defendant now on appeal did not represent the defendant in the trial of the case (such is the case here), but he was represented by able counsel who did not choose to request such an instruction."

Though the facts in the Cordonnier case, supra, are not identical, the same question was involved and we feel the law stated therein is applicable here.

■ The next complaint of defense counsel is based upon the court failing to instruct upon the law of circumstantial evidence. Again we state that defendant failed to request such an instruction. This question has been clearly decided by this court on numerous occasions. Teague v. State, 58 Okl.Cr. 239, 52 P.2d 91; Watson v. State, 58 Okl.Cr. 448, 54 P.2d 1097; Bock v. State, 34 Okl.Cr. 313, 246 P. 642. This court said in the Teague case, supra [58 Okl.Cr. 239, 52 P.2d 95]

"Where circumstantial evidence alone is relied on for a conviction, it is the duty of the court to instruct on the law applicable thereto on his own motion, and he must so instruct *when requested* by defendant. When, however, the case rests on circumstantial evidence, and no request for an instruction on the law of circumstantial evidence is made by defendant, the failure does not constitute reversible error; the presumption being that defendant is satisfied with the charge."

This contention has less merit by reason of the direct testimony connecting defendant with the commission of the crime. Defendant's admission to Officer Moncrief to the taking of the car makes it quite evident that the state did not rely solely upon circumstantial evidence. And, we

believe that defendant's statement was more than an inference, but was sufficient to strongly support his conviction.

■ It is contended that the trial court erred by sustaining objection for the state to question concerning witness Olive Hawkins' interest in said cause. The record reflects that the following question was directed to said witness:

"Are you in any way charged, that you know of, with participation in this car theft?"

The county attorney objected and the court sustained the objection. The attorney general admits this was error, but not such error as would justify reversal. We agree that defendant had a right to make such an inquiry and a right to have said question answered. It is well established the defendant has a right to question a witness about any interest they might have in the case or to examine upon any matter which has a tendency to lessen credibility of a witness, show his bias or prejudice, friendship or emnity to either party to a lawsuit or a circumstance in which witness would be tempted to swear falsely. Hammons v. State, 96 Okl.Cr. 326, 254 P.2d 793. Also see Blumhoff v. State, 72 Okl.Cr. 339, 116 P.2d 212; Beason v. State, 18 Okl.Cr. 388, 195 P. 792.

■ In the case before us the record does not reflect that the witness was charged with the defendant in the theft of the auto; neither does the evidence connect her with the theft. She testified that she was hospitalized after the wreck for about four weeks; she went to her sister's home in Norman after leaving the hospital and had been in jail 10 weeks previous to trial. Defendant testified that witness was charged along with him for the theft of television sets which charges were dismissed when Joe Clark plead guilty to the charge. Witness further testified she had been in jail as hereto related because she was being held as a material witness in the case at bar. The preliminary complaint charged only the defendant. The record shows that an order was issued directing that the witness be arrested and held as a material witness. It is evident that if the witness had been permitted to answer it would not have been helpful to the defendant. The trial court was in error in sustaining the county attorney's objection. However, in view of the entire record from which the jury could draw their conclusions, it was not error of such consequence as to justify reversal. There were other contentions of defendant as to the introduction of improper evidence relative to threats made by defendant to witness Hawkins prior to the commission of the alleged crime to defendant's previous marital difficulties and to the effect that defendant was an "Atheist." Though it is doubtful if proper or timely objections were made to these admissions, they had no place in the trial of the lawsuit and could serve no purpose except to prejudice the jury against defendant. One witness testified for the state that the defendant had told her he was an Atheist. This was most improper and is most assuredly incompetent testimony. The religious beliefs of a defendant are wholly inadmissible where proper or timely objections are made. Though it is conceded an Atheist is to be pitied and their beliefs generally considered warped and most difficult to diagnose, yet under our system granting freedom of religion, speech, etc., there is no distinction to be drawn in the application of the law upon believers and non-believers. Portraying the defendant as an Atheist would not tend to prove his guilt nor his innocence. The potentiality of its prejudicial effect could be elaborated upon at great length and had proper or timely objection been made, no hesitancy would be encountered in reversing said cause. Even without objection it would be folly to presume the defendant was not prejudiced by such testimony.

■ The record reveals no previous convictions of the defendant. His punishment was assessed at 10 years in the penitentiary. The statute provides a penalty of 3 to 20 years. In a review of the cases of this court the penalty appears severe for

one without a previous record. This court has in numerous cases reduced the penalty for automobile theft from 10 to 5 years. See Ballard v. State, 68 Okl.Cr. 39, 95 P.2d 239; Quitman v. State, 35 Okl.Cr. 245, 250 P. 441; Bryant v. State, 33 Okl.Cr. 383, 244 P. 453.

Because of the numerous irregularities discussed in this opinion and the improper admission of prejudicial testimony, we feel that justice would be best served by modifying the judgment and sentence of the trial court from 10 years in the state penitentiary to 5 years and otherwise affirming said case.

BRETT, P. J., and POWELL, J., concur.