Alfredo OMALZA, Ronnie Lee Floyd, David Lee Flippo, Appellants,

v.

STATE of Oklahoma, Appellee.

Nos. F–93–141, F–93–336, and F–93–65.

Court of Criminal Appeals of Oklahoma.

Dec. 29, 1995.

Rehearing Denied Feb. 27, 1996.

**25.** *Application of State ex rel. Dept. of Transp., supra* note 20 at 609; *Hendrick, supra* note 20 at 1238.

William Devinney, Gary Shores, Oklahoma City, for Omalza at trial and on appeal.

James Berry, Sherry T. Wallace, Oklahoma City, for Floyd at trial.

Richard Anderson, David Autry, Oklahoma City, for Flippo at trial and on brief.

Fern Smith, Sandra Stensaas, Oklahoma City, for State at trial.

James Berry, Oklahoma City, for Floyd on appeal.

Susan Brimer Loving, Attorney General of Oklahoma, A. Diane Blalock, Assistant Attorney General, Oklahoma City, for appellee on appeal.

*OPINION*

## PER CURIAM:

Appellants, Alfredo Omalza, Ronnie Lee Floyd and David Lee Flippo, were tried separately by jury in the District Court of Oklahoma County, Case No. CRF–89–4717 before the Honorable James B. Blevins, District Judge.[1] Omalza was convicted of two counts of Murder in the first degree (21 O.S.Supp. 1982, § 701.7(A)) and one count of Conspiracy to Commit Murder (21 O.S.1981, § 421).[2] The jury recommended death for both counts of malice murder, after finding the existence of five aggravating circumstances,[3] and one hundred (100) years imprisonment for conspiracy. The trial court sentenced Omalza accordingly. Floyd was convicted of two counts of Murder in the first degree (21 O.S.Supp.1982, § 701.7(A)).[4] The jury recommended death for both counts of malice murder after finding the existence of four aggravating circumstances.[5] The trial court sentenced Floyd accordingly. Flippo was convicted of two counts of Murder in the first degree[6] (21 O.S.Supp.1982, § 701.7(A)) and

1. Omalza, Flippo and Floyd were charged conjointly along with Patricia Beth Jones. The trial court severed the cases for trial. Omalza filed his brief in chief with this Court on August 29, 1994 and the State filed its answer brief on October 28, 1994. No reply brief was filed. Oral argument was held July 11, 1995. Floyd filed his brief in chief with this Court on June 30, 1994 and the State filed its answer brief on September 14, 1994. Floyd's reply brief was filed on September 27, 1994 and oral argument was held January 31, 1995. Flippo filed his brief in chief with this Court on May 24, 1994 and the State filed its answer brief on September 22, 1994. Flippo's reply brief was filed on October 12, 1994.

2. Omalza was originally charged with two counts of First Degree Malice Murder or in the alternative Felony Murder, two counts of Kidnapping, one count of Conspiracy to Commit Kidnapping and one count of Conspiracy to Commit Murder. The trial court sustained his demurrer to both counts of Kidnapping, Conspiracy to Commit Kidnapping and both alternative Felony Murder counts.

3. [1] the defendant knowingly created a great risk of death to more than one person; [2] the murder was especially heinous, atrocious, or cruel; [3] the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; [4] the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing

threat to society; and [5] the murder was committed by a person while serving a sentence of imprisonment on conviction of a felony. *See* 21 O.S.1981, § 701.12(2), (4), (5), (6) and (7), respectively.

4. Floyd was originally charged with two counts of First Degree Malice Murder or in the alternative Felony Murder, two counts of Kidnapping, one count of Conspiracy to Commit Kidnapping and one count of Conspiracy to Commit Murder. The trial court sustained his demurrer to both counts of Kidnapping, both counts of Conspiracy and both alternative Felony Murder counts.

5. [1] the defendant knowingly created a great risk of death to more than one person; [2] the murder was especially heinous, atrocious, or cruel; [3] the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and [4] the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.1981, § 701.12(2), (4), (5) and (7), respectively.

6. Flippo was originally charged with two counts of First Degree Malice Murder or in the alternative Felony Murder, two counts of Kidnapping, one count of Conspiracy to Commit Kidnapping and one count of Conspiracy to Commit Murder. The trial court sustained his demurrer to both counts of Kidnapping, both counts of Conspiracy and both alternative Felony Murder counts.

was sentenced to two consecutive sentences of life without parole. From these Judgments and Sentences, they appeal. For purposes of these appeals, we find it expeditious to consolidate these cases on our own motion for review since common errors necessitate reversal. Rule 3.3, *Rules of the Court of Criminal Appeals*, 22 O.S.Supp.1993, Ch. 18, App.

## I. FACTS

On March 9–10, 1988, the bodies of Kim Gaylene Grant and Harrell "Rob" Robinson were found in a shallow grave in a ravine near Lake Stanley Draper in Cleveland County. Robinson had sustained two fatal head wounds and a fatal stab wound that pierced his aorta. Robinson had also sustained numerous post-mortem stab and incise wounds to his head, throat, neck, shoulder, arms and left hand. Robinson's right hand had been amputated and was found laying on his chest. Grant had sustained two fatal stab wounds that passed through her body piercing her heart and lungs. The uncontroverted evidence established they were not killed at the burial site.

The State theorized Patricia Beth Jones conspired with Omalza, her incarcerated boyfriend, to kill Grant so Grant could not testify against Jones in their pending drug case.[7] Omalza then telephoned Floyd and Flippo and told them to lure Grant and Robinson to some location on the pretext of selling them drugs. Omalza ordered Floyd and Flippo to kidnap Grant and Robinson, take them to Floyd's father's house and scare them. If Grant refused to recant her preliminary hearing testimony incriminating Jones, Floyd and Flippo were to kill them and make it look like a suicide.

The State attempted to prove at trial that Grant and her boyfriend, Robinson, were kidnapped, held at Floyd's house and murdered by Floyd and Flippo before being dumped at Draper Lake. The State's case was impeded by the facts that the murder site was never found, no forensic evidence connected Floyd

and Flippo to the murders, and that none of the alleged conspirators testified at trial.

## II. VENUE

Appellants each raise two venue issues for our consideration: [1] that the State did not carry its burden to prove venue was proper in Oklahoma County in each case; and [2] that the contested issue of venue should have been submitted to the jury in each instance. These issues were preserved by the defense attorneys' demurrer to venue at the close of the State's case and by their requests for appropriate instructions.

The Oklahoma Constitution grants an accused the right to be tried in the county in which the crime charged was committed.

> In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed or, where uncertainty exists as to the county in which the crime was committed, the accused may be tried in any county in which the evidence indicates the crime might have been committed.

Okla. Const. art. 2, § 20.[8]

■ The nature of this constitutional right can best be discerned through the mosaic of case law which has developed around it. Venue is treated differently from other constitutional rights for waiver of this right may be found from a silent record. *See Application of Poston*, 281 P.2d 776, 783 (Okl.Cr.1955). And while the State bears the burden to prove venue, the standard of proof is not the same as the elements of the crime, i.e., beyond a reasonable doubt, but is merely by a preponderance of the evidence. *Rawlings v. State*, 740 P.2d 153, 159 (Okl.Cr.1987). Evidence sufficient to establish venue may be direct or circumstantial. *Id.; Morris v. State*, 363 P.2d 377, 379 (Okl.Cr.1961). Venue, in Oklahoma, is not an element of the crime. *Id.* (*citing Kilpatrick v. State*, 90 Okl.Cr. 276, 278, 213 P.2d 584, 585 (1950)).

---

7. Jones, Grant and Deborah Ross were charged with attempting to smuggle heroin into Mabel Bassett Correctional Center.

8. We analyze this issue solely on state grounds for the venue provision in the federal constitution refers to jurisdiction of the federal district court. *See* U.S. Const., amend. VI.

It is not the same as jurisdiction: venue may be waived, but jurisdiction may not. *See, e.g., Smith v. State*, 554 P.2d 851, 854–55 (Okl.Cr.1976) (venue); *Snodgrass v. State*, 478 P.2d 965, 967 (Okl.Cr.1970) (venue); *Morris*, 363 P.2d at 379 (venue); *Munson v. State*, 758 P.2d 324, 332 (Okl.Cr.), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1988) (jurisdiction); *Guthrey v. State*, 374 P.2d 925, 927 (Okl.Cr.1962) (jurisdiction).

 Looking first at the evidence to support venue in Oklahoma County, we find the following evidence in the records of these cases. The victims were found approximately one block from the Oklahoma County line in Cleveland County. Robinson's car was found nearby, across the county line in Oklahoma County, on a dead-end dirt trail which was part of a system of off-road trails at Draper Lake. Grant and Robinson were not killed in Cleveland County where they were found. At the time of the murders, Jones, Floyd, Flippo and Robinson were residents of, or staying in Oklahoma County.

The location of the bodies so near the Oklahoma County line, the location of Robinson's car in Oklahoma County, the system of dirt trails leading from Oklahoma County to the grave site, the residence of Jones, Floyd, Flippo and Robinson, and the absence of any evidence beyond the burial site to any other venue is sufficient to prove by a preponderance of the evidence that the murders *might* have been committed in Oklahoma County.[9] The evidence thus satisfies the Oklahoma Constitution and the State's burden to prove venue by a preponderance of the evidence.

 We next examine Appellants' argument that venue is a jury question. Appellants each challenged venue following preliminary hearing by a motion to quash which was granted. This ruling was later withdrawn and reversed. At each trial when the State rested, the defense renewed its challenge of venue by demurrer. The trial court denied the demurrer. At the close of the first stage of each trial, the defense asked that the issue of venue be put to the jury using a requested instruction. The trial court denied the requested instruction in each trial. Appellants argue the trial court thereby committed reversible error.

Having found venue is not an element of the crime, but rather is an element in the determination of the trial court's ability to hear the case, we find venue is solely for the trial court to determine. In the present cases the trial court properly denied the defense request to submit the issue to the jury. We expressly overrule any language to the contrary which may be found in prior cases.[10]

### III. ALFREDO OMALZA

#### A. HEARSAY

In his first assignment of error, Omalza claims he was denied a fair trial because the trial court admitted, over objection, many forms of inadmissible hearsay to his detriment. We agree.

 Omalza specifically argues the trial court erred in admitting inadmissible hearsay statements under the coconspirator exclusion. *See* 12 O.S.1981, § 2801(4)(b)(5). A statement which is offered against a party and made by his coconspirator during the course and in furtherance of their conspiracy is admissible and is *not* hearsay. 12 O.S.

---

9. The Court is aware Lisa Shepherd testified she saw a man and a woman tied up lying on plastic on the floor of Ronnie Floyd's home in Oklahoma County. This evidence is not considered here for she did not know when she saw them or who they were. In Flippo's trial she stated Flippo was present, but failed to identify him at the *Harjo* hearing, and did not identify him at trial. *Harjo v. State*, 797 P.2d 338 (Okl.Cr.1990). Further, the trial court in *Flippo* improperly barred impeachment of Shepherd with her own statements that she did not know if what she remembered was fact or fantasy. *See* V C, *infra*.

10. *Burns v. District Court of Oklahoma County*, 335 P.2d 923, 929–30 (Okl.Cr.1959) is not in direct conflict with our opinion herein. In *Burns* the Court directed the issue to the trial court, but unartfully approved the use of the motion for directed verdict to challenge venue. *Wooldridge v. State*, 659 P.2d 943, 947 (Okl.Cr.1983), on the other hand, implies that the submission of venue to the jury as a material allegation to be proven beyond a reasonable doubt is proper procedure. It is not.

1981, § 2801(4)(b)(5).[11] *See also Armstrong v. State,* 811 P.2d 593, 597 (Okl.Cr.1991). However, before alleged coconspirator statements can be admitted against a defendant, the trial court is required to hold an *in camera* hearing to determine whether a conspiracy existed. *Harjo v. State,* 797 P.2d 338, 345 (Okl.Cr.1990). The conspiracy must be proven by a preponderance of evidence and the trial court may consider the alleged hearsay statements in reaching its decision. *Id.* A coconspirator's statements satisfy the requirements of reliability and are admissible as non-hearsay substantive evidence only where the trial court finds: [1] a conspiracy existed; [2] both the defendant and the alleged coconspirator declarant were parties to the conspiracy; [3] the statements were made during the duration of the conspiracy; and [4] the statements furthered the goals of the conspiracy. *Id.*

■ The trial court properly held the *in camera* hearing in Omalza's trial. At the conclusion of the hearing the trial court properly found that the State had proved the existence of a conspiracy by a preponderance of the evidence and that Omalza was a party to it.[12] However, when the State sought to admit the co-conspirator statements at trial, the trial court failed to apply the limits of time and content imposed by section 2801(4)(b)(5). The trial court disregarded its earlier finding that the conspiracy existed from February through March and admitted any statement made at any time to anyone by any coconspirator. Consequently, many inadmissible hearsay statements were admitted over strenuous objection.

■ We must now determine if the admission of the inadmissible hearsay requires reversal or is harmless beyond a reasonable doubt. *Mayes v. State,* 887 P.2d 1288, 1307 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). This Court will review the improperly admitted hearsay evidence and weigh its effect against the properly admitted evidence of guilt. *Id.* We find it appropriate to categorize the statements according to time and content. We first review the challenged statements to determine if they were made during the course of the conspiracy. If so, we must then review the statements to determine if they furthered the conspiracy.

■ A conspiracy is an agreement between two or more people to commit a crime, plus an overt act in furtherance of the agreement. 21 O.S.1981, §§ 421 and 423. Because agreement alone does not create a conspiracy, a conspiracy begins with the first overt act following the agreement. 21 O.S. 1981, § 423. Generally, the conspiracy ends when its objective is accomplished. *Jones v. State,* 738 P.2d 525, 527 (Okl.Cr.1987); *Kelly v. State,* 692 P.2d 563, 565 (Okl.Cr.1984) (holding conspiracy to commit murder terminates when murder accomplished). However, a murder conspiracy can extend beyond the murder and include concealment of evidence, alteration of the crime scene and disposal of weapons and other evidence. *Mann v. State,* 749 P.2d 1151, 1158 (Okl.Cr.), *cert. denied,* 488 U.S. 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988).

The State alleged Omalza agreed to help Jones by arranging to have Grant kidnapped and/or murdered in early 1988. The first overt act in furtherance of the agreement was Omalza's telephone call to Floyd in which he enlisted Floyd's assistance in eliminating Grant. Although no specific date was established for this telephone call, the record indicates the telephone call occurred sometime in late January or early February, 1988. With Omalza's telephone call to Floyd the conspiracy was born. At trial the State did not elicit any evidence to extend the conspiracy beyond the discovery of the bodies as

---

**11.** Title 12 O.S.1981, § 2801(4)(b)(5) provides:
A statement is not hearsay if:
b. the statement is offered against a party and is (5) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**12.** The trial court specifically found that the members of the conspiracy were Omalza, Jones and Floyd (and did not include Flippo) and that the conspiracy existed from February 14, 1988 through March 17, 1988. However, as noted *infra,* no evidence exists to support the trial court's finding that the conspiracy lasted beyond discovery of the bodies which occurred on March 9–10, 1988.

there was no evidence that any of the alleged coconspirators concealed evidence, altered the crime scene or disposed of weapons and other evidence after the murders.[13] Therefore, for coconspirator statements to be admissible under section 2801(4)(b)(5), they must have been made after Omalza's telephone call to Floyd and before the bodies were discovered on March 9–10, 1988.

■ We now examine the challenged statements to determine which of the statements occurred during the duration of the conspiracy. Patricia Arnold testified extensively about five occasions when Jones made incriminating statements to her. Only one of the occasions was during the course of the conspiracy.[14] The other four occasions were after the bodies were discovered. Therefore, the incriminating statements made by Jones on March 10, 1988, on Arnold's answering machine after hearing about the discovery of the bodies and Jones' statements to Arnold on March 12, 16 and 17, 1988,[15] do not satisfy the time requirement of section 2801(4)(b)(5) and should not have been admitted under the coconspirator exclusion.

■ However, the statement Jones made on Arnold's answering machine on March 10, 1988, that "Kim was dead" and urging Arnold to contact her was not offered to prove Grant was dead but was offered to show Jones knew the bodies had been discovered and was nervous. Therefore, this statement was not hearsay and was admissible. Arnold's personal observations of Jones on March 12, 1988, were also admissible. Arnold testified she drove to a motel and picked up Jones whereupon they went to buy a newspaper and map. They also went to a post office in Moore where Jones retrieved a letter. While Arnold's personal observations were admissible, Jones incriminating statements were not.

■ Linda Martindale testified Jones told her that she told Grant not to come back to court after Jones' and Grant's preliminary hearing in the Mabel Bassett drug smuggling case. Martindale also testified she accompanied Jones to a house on Triple X Road in late 1987. Jones said they needed to go to the house so they could move some of "Pineapple's stuff." [16] Jones' statements to Martindale were made prior to any agreement between Jones and Omalza. Therefore, Jones' statements to Martindale cannot be admitted under the coconspirator exclusion or any other exception to the hearsay rule.

■ Roberta Lancaster testified Jones offered her and Angela Hickson two hundred fifty dollars ($250.00) to hold Grant hostage because Grant was "turning State's evidence" against Jones. Lancaster could not remember when this conversation occurred, but estimated it occurred sometime in January or February 1988. We find Jones' offer to Lancaster and Hickson to hold Grant hostage was not made during the conspiracy, but prior to the agreement with Omalza. We find it unlikely Jones would solicit others to eliminate Grant after Omalza agreed to do so.

■ Lancaster also related an incident in which she heard Jones on the telephone allegedly speaking to Omalza. Jones was talking about picking up a birthday cake that had been ordered from a pharmacy. Jones also told Omalza during the conversation Allen Beard was next to be killed at Draper Lake. The only time frame established about the birthday cake conversation was that it occurred prior to the bodies being found. Because it is impossible to conclude from this record if these statements were made before or after the murders had occurred, we cannot find Jones' statements concerning the birthday cake and Allen Beard occurred during

---

**13.** Because the medical examiner could not conclude how long the bodies had been in the ravine but opined they had probably been there about two days, we shall use the discovery of the bodies on March 9–10 as the event which establishes the termination of the conspiracy.

**14.** Jones told Arnold sometime around February 14, 1988 that she had to get her court date continued because Grant was not dead yet.

**15.** This includes the recordings of these statements. *See* State's Exhibits 82, 82A and 107.

**16.** Omalza was also known by the nickname "Pineapple."

the time of the conspiracy. However, the statements about the birthday cake and Allen Beard were not offered to prove the truth of the matter asserted, but to show Jones' knowledge of the conspiracy. Therefore, they are not hearsay.

■ Lancaster also testified Jones said a week or so after the bodies were discovered "the snitching bitch had got what she had coming to her" and she did not have to worry about the "bitch" anymore. Because there is no evidence to extend the conspiracy beyond discovery of the bodies, Jones' statements to Lancaster after the bodies were discovered cannot be admitted under the co-conspirator exclusion or any other exception to the hearsay rule.

■ Michael Hull, a handwriting expert with the Oklahoma City Police Department, identified a piece of notebook paper with a list of names under the heading "no people" [17] as being written by Jones. Grant's name was the last on the list followed by the notation "for sure. Please P.A. promise me to make her life a living hell. That I want you to do just for me. Love, Pat." The only date on the piece of paper is the notation at the bottom which says "Gayle Barrett living at Della's 2–1–88 owes you $350." Hull's conclusion concerning the identity of the author was admissible pursuant to 12 O.S.1981, § 2702, but the hearsay statement of Jones was not. We cannot conclude Jones' written statement to make Grant's life a living hell was made during the course of the conspiracy. No facts were established to allow such a finding. Therefore, the statement cannot be admitted under the coconspirator exclusion.

■ Pam Hill testified Jones came to her house and asked Floyd to help her retrieve and sell some of Omalza's cars. Hill also said Jones "store[d]" some pistols at her home which Jones claimed belonged to Omalza. Jones' statements asking Floyd for assistance were not offered to prove Jones needed help retrieving and selling Omalza's cars, but were offered to show Jones met with Floyd several weeks before the murder.

Hill could certainly testify to her personal knowledge that Jones stored pistols at her home. However, Jones' statement the pistols belonged to Omalza was hearsay and could not be admitted under the coconspirator exclusion because no time frame was established. Nor could the statement be admitted under any other hearsay exception.

■ Lisa Shepherd testified that Floyd told her sometime after the murders she was going to be his alibi witness. The State failed to show the statement was made during the time frame of the conspiracy. However, the statement was not offered to prove Shepherd would be Floyd's alibi witness, but to prove Floyd's state of mind and to explain why Shepherd never went back to Floyd's house. Therefore, the statement is not hearsay.

■ Gary Jones, husband of Patricia Beth Jones, testified Jones told him to come home because she heard about the police finding Grant's body. Jones also told Gary Jones that her attorney advised her to go to a hotel so the police would not pick her up for questioning until after the weekend. Clearly, these statements were made after the bodies were found and the conspiracy ended. Accordingly, these statements cannot be admitted under the co-conspirator exclusion.

■ Lastly, Gayla Hood testified Flippo told her he married his wife so she could not testify against him. Hood also testified during that same conversation Flippo told her "he" or "they" had taken care of two snitches. Hood could not recall when the conversation took place and attempts to refresh her memory proved unsuccessful. Flippo's statement itself shows the murders had been accomplished. Consequently, we find the statements were not made during the course of the conspiracy. Therefore, Flippo's statements cannot be admitted under the coconspirator exclusion.

■ The danger of admitting such hearsay statements lies in the accused's inability to cross-examine the declarant. *Mayes*, 887

---

17. *See* State's Exhibit 67. This exhibit was admitted during the testimony of Pam Hill who testified she gave the entire notebook including State's Exhibit 67 to Detective Mullenix.

P.2d at 1307. Yet, courts have long admitted certain evidence under exceptions to the hearsay rule because "[a]dmission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638, 653 (1990). The Confrontation Clause permits the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial as long as there is an adequate indicia of reliability or particularized guarantees of trustworthiness. *Wright,* 497 U.S. at 814–15, 110 S.Ct. at 3146, 111 L.Ed.2d at 651–52.

■ In the instant case, Omalza's Confrontation Clause rights were not satisfied. However, the error does not necessitate reversal if this Court is satisfied the improper admission of the hearsay statements did not contribute to the verdict. *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705, 710 (1967). We cannot find the error in this case harmless beyond a reasonable doubt. The State conclusively proved that Grant and Robinson were murdered. The only issue in dispute was *who* killed them. The inadmissible hearsay statements were significant in connecting Omalza to Jones, Floyd and Flippo and making the State's theory understandable. We cannot say that the incriminating hearsay statements did not contribute to the verdict. Accordingly, we find this case must be reversed and remanded for new trial.

To expedite review and assist trial courts, the following procedures shall be observed when the State seeks to introduce co-conspirator hearsay statements. The trial court shall conduct a *Harjo* hearing at which the State shall call each witness from whom it intends to elicit coconspirator statements.

The State shall produce evidence from which the trial court can make a ruling on the duration and objectives of the conspiracy. The trial court should consider all the evidence presented to determine the duration and objectives of the conspiracy and not limit itself to events which occurred prior to the completion of the conspiracy's principal aim. At the conclusion of the hearing the trial court shall announce its ruling which shall include the parties to the conspiracy, the dates or events which establish the duration of the conspiracy and its finding of which statements further the conspiracy and are therefore admissible under section 2801(4)(b)(5). This ruling shall be binding on the parties throughout the trial. The trial judge should be diligent and consistent in enforcement of the ruling.

## B. IMPEACHMENT

In his second proposition of error, Omalza argues the trial court allowed the State to impeach its witnesses with inadmissible hearsay and improperly instructed the jury on the use of impeachment evidence.

■ First, Omalza argues the State was allowed to impeach its own witnesses [18] with inadmissible hearsay. Throughout the trial the State impeached its witnesses with each witness' prior inconsistent statements made during Jones' and Flippo's trials, their prior inconsistent statements made at the preliminary hearing in this matter and their prior inconsistent statements made to the police. The State was also allowed to impeach Donnie Cargle with inconsistent statements he made during a "sworn deposition." [19]

It cannot be disputed that the State may call a witness and impeach his or her credibility. *Kinsey v. State,* 798 P.2d 630, 633 (Okl.Cr.1990); *Smith v. State,* 766 P.2d 1007, 1008 (Okl.Cr.1988); 12 O.S.1981, § 2607. However, we must determine whether the State properly impeached its witnesses in this case. We must also determine if any of

---

18. Without citing any specific instances, Omalza challenges the statements used to impeach Linda Martindale, Roberta Lancaster, B.J. Flippo, Pam Hill, Gayla Hood, Bobby Liebman, Lisa Shepherd, Debbie Ross, George Loveland and Donnie Cargle.

19. The State referred to Cargle's sworn statement to Detective Mullenix and Assistant District Attorney Fern Smith as a deposition. However, the procedures for deposing a witness were not followed and this so-called deposition is nothing more than a sworn statement.

the impeachment evidence could be used as substantive evidence of guilt.

Prior to the enactment of the Oklahoma Evidence Code, prior inconsistent statements were admissible to show a witness had previously made statements inconsistent with his/her trial testimony if the party offering the statement was surprised or prejudiced by the witness' trial testimony. *Pettigrew v. State,* 346 P.2d 957, 967 (Okl.Cr.1959); *Akins v. State,* 91 Okl.Cr. 47, 51, 215 P.2d 569, 572–73 (1950). These inconsistent statements were to be considered only for the purpose of impeachment and to explain the calling of such witness, not as substantive evidence tending to prove the truth of the facts stated. *Id.*

In 1978, the Legislature enacted the Oklahoma Evidence Code, 12 O.S.Supp.1978, § 2101 *et. seq.,* (hereinafter Code) to develop the law of evidence so that the truth could be ascertained and proceedings justly determined. *See* 12 O.S.Supp.1978, § 2102. The Legislature expressly made the rules enunciated in the Code applicable in criminal proceedings. 12 O.S.Supp.1978, § 2103. In enacting the Code the Legislature made several changes to existing law. Specifically, the Legislature changed the rules concerning who could impeach a witness and how prior inconsistent statements could be used. *See* 12 O.S.Supp.1978, §§ 2607 and 2801(4)(a)(1). As these rules have not been changed since the enactment of the Code, we must now examine the applicable provisions at issue in this case.

Title 12 O.S.1981, § 2607 provides the credibility of a witness may be attacked by any party, including the party calling him. Section 2607 marked a complete departure from existing law which did not permit a party to impeach his own witness absent proof of surprise or prejudice. The subcommittee noted that it abandoned the traditional rule because it was based on false premises. We agreed and upheld this construction of section 2607 in *Smith,* 766 P.2d at 1008–09. *See also Kinsey,* 798 P.2d at 633–34.

The Code also set forth procedures for questioning witnesses about their prior statements in 12 O.S.1981, § 2613. Prior statements of a witness need not be shown nor their contents disclosed prior to questioning the witness about the statements. Further, extrinsic evidence of prior inconsistent statements by a witness may be admissible if the witness is afforded an opportunity to explain or deny the statements and the opposing party is given the opportunity to interrogate the witness about his statements.

 The Code also changed the rules concerning the use of prior inconsistent statements. Title 12 O.S.1981, § 2801(4)(a)(1) provided:

4. A statement is not hearsay if: a. the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition. . . .

The Code made inconsistent statements which meet the requirements of section 2801(4)(a)(1) non hearsay and admissible. Although we have never specifically addressed the substantive use of inconsistent statements, we find section 2801(4)(a)(1) places significant safeguards on the admission of prior inconsistent statements such that there is little reason to exclude them as substantive evidence. Therefore, we hold that inconsistent statements which meet the requirements of section 2801(4)(a)(1) may be considered as substantive evidence.

Omalza argues the admission of B.J. Flippo's, Hill's, Hood's, Liebman's, Shepherd's, Ross', Loveland's and Cargle's inconsistent statements from Jones' trial, Flippo's trial and their joint preliminary hearing denied him the right to confront witnesses against him. He further claims these inconsistent statements could not be used as substantive evidence of guilt against him. He bases his claim on the fact that most of these witnesses, although present and testifying, nonetheless claimed no recollection of either the underlying events described in their prior testimony or the giving of the testimony itself. Because the witnesses claimed a lack of memory, Omalza claims he could not confront and cross-examine the witnesses about their statements.

■ The Supreme Court addressed and rejected this same argument in *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).[20] The Court held the admission of testimony concerning a prior out of court identification did not violate the Confrontation Clause or Federal Rule of Evidence (hereinafter FRE) 801 where the identifying witness was unable, because of memory loss, to explain the basis of his identification. *Id.* at 564, 108 S.Ct. at 845, 98 L.Ed.2d at 961. The Court found that "a [physically available] witness's inability to 'recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence.'" *Owens*, 484 U.S. at 558, 108 S.Ct. at 842, 98 L.Ed.2d at 957 (*quoting California v. Green*, 399 U.S. 149, 188, 90 S.Ct. 1930, 1951, 26 L.Ed.2d 489, 514 (1970)). When a hearsay declarant is present at trial and subject to unrestricted cross-examination, the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the Confrontation Clause. *Id.* at 560, 108 S.Ct. at 843, 98 L.Ed.2d at 958–59. Consequently, we find, based on *Owens*, Omalza was not denied his right to confront the above witnesses even though they claimed a lack of memory because they appeared at trial under oath and the jury could observe their demeanor.

We must now determine whether the witnesses' testimony falls within the purview of section 2801(4)(a)(1) so it could be used as substantive evidence of guilt. As discussed above, section 2801(4)(a)(1) defines as non hearsay prior inconsistent statements given under oath subject to penalty of perjury at a trial, hearing, deposition or other proceeding if the declarant testifies at the trial or hear-

ing and is subject to cross-examination concerning the statement.

In *Owens*, the Supreme Court interpreted the phrase "subject to cross-examination" in reference to FRE 801(d)(1)(C)[21] which has the same cross-examination requirement as section 2801(4)(a)(1). The Court found the natural reading of "subject to cross-examination concerning the statement" means placing a witness on the stand, under oath, and having him respond willingly to questions. *Id.* at 561, 108 S.Ct. at 844, 98 L.Ed.2d at 959. The Court noted the witness' assertion of memory loss is often the very result sought to be produced by cross-examination and can be effective in destroying the force of the prior statement. *Id.* at 562, 108 S.Ct. at 844, 98 L.Ed.2d at 959. The Court concluded the witness in *Owens* was subject to cross-examination notwithstanding his forgetfulness because he answered questions regarding his prior identification and statements and the factfinder could evaluate his prior statements in light of his present inability to remember the factual basis underlying them. *Id.*

Omalza argues that this reading of "subject to cross-examination" is impermissible because it creates an internal inconsistency in the Rules, since the forgetful witness who is deemed "subject to cross-examination" under section 2801(4)(a)(1) is simultaneously deemed "unavailable" under 2804(A)(3). The *Owens* Court rejected this argument finding "this is not a substantive inconsistency, but only a semantic oddity...." *Id.* at 563, 108 S.Ct. at 844, 98 L.Ed.2d at 960. We agree. Both section 2801 and FRE 801 specify "that the cross-examination need only 'concer[n] the statement,'" and do not on their face require more. *Id.* at 562, 108 S.Ct. at 844, 98 L.Ed.2d at 959. As the *Owens* Court noted Congress could have easily placed in FRE 801 the restrictions in FRE 804(a)(3), which

20. We will consider United States Supreme Court and other federal opinions in interpreting our State Evidence Code provisions. *Taylor v. State*, 889 P.2d 319, 328 n. 29 (Okl.Cr.1995); *Beck v. State*, 824 P.2d 385, 389 (Okl.Cr.1991) (holding that in the absence of state cases interpreting a particular section of the Evidence Code, this Court will look to United States Supreme Court's construction of counterpart section in Federal Rules of Evidence).

21. FRE 801(d)(1)(C) provides:

A statement is not hearsay if—(1) the declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (C) one of identification of a person made after perceiving the person....

defines "[u]navailability as a witness" to include situations in which a declarant "testifies to a lack of memory of the *subject matter* of the declarant's statement." (emphasis added) Congress plainly was aware of the recurrent evidentiary problem of witness forgetfulness of an underlying event, but chose not to make it an exception to FRE 801. *Id.* at 562, 108 S.Ct. at 844, 98 L.Ed.2d at 960.

We find *Owens* dispositive and note it would seem strange to assert that a witness can avoid introduction of testimony from a prior proceeding that is inconsistent with his trial testimony by simply asserting a lack of memory of the facts to which the prior testimony related. We find the two rules with their requirements are made for two entirely different purposes and there is no requirement or expectation that they should coincide.

We note there may be instances in which a witness' claim of memory loss could prevent the witness from being subject to cross-examination. *U.S. v. Tome,* 3 F.3d 342, 348 (10th Cir.1993), *reversed and remanded on other grounds,* —— U.S. ——, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). Nevertheless, this is not such a case. In this case the State impeached its witnesses with their testimony from Jones' trial, Flippo's trial and the preliminary hearing. While the witnesses initially claimed a lack of memory, in the majority of instances the witnesses did not dispute the transcript of their prior testimony or claimed they lied at the previous trials and hearing. The State and the defense then questioned the witnesses extensively about their prior statements, their memory loss and their motivations. Consequently, we find these inconsistent statements meet the requirements of section 2801(4)(a)(1) and can be used as substantive evidence of guilt because they were made when the witnesses were under oath, subject to the penalty of perjury at a trial or hearing and were subject to cross-examination.

■ The State also impeached its witnesses with inconsistent statements they made to police. We particularly note the impeachment of B.J. Flippo, George Loveland and Donnie Cargle. While the State could impeach its witnesses with their rele-

vant inconsistent statements, 12 O.S.1981, §§ 2607 and 2613, only those inconsistent statements which meet the requirements of section 2801(4)(a)(1) could be used as substantive evidence of guilt.

■ Inconsistent statements made to police whether sworn or unsworn do not meet the requirements of section 2801(4)(a)(1) because the statements are not made during any trial, hearing, deposition or proceeding. "Proceeding" is defined in BLACK'S LAW DICTIONARY 629 (5th ed. 1983) in pertinent part:

> [T]he form and manner of conducting juridical business before a court or judicial officer. Regular and orderly progress in form of law, including all possible steps in an action from its commencement to the execution of judgment. [Proceeding] also refers to administrative proceedings before agencies, tribunals, bureaus, or the like.

■ Giving a sworn statement to a police officer or district attorney does not constitute a proceeding for purposes of section 2801(4)(a)(1), but such statements can be used to impeach the witness concerning his testimony. 22 O.S.1981, § 749(B). Therefore, B.J. Flippo's, Loveland's and Cargle's inconsistent statements to police can only be used for impeachment purposes.

■ Lastly, Omalza argues the trial court improperly instructed the jury on the use of these inconsistent statements which were offered to impeach State's witnesses. At the conclusion of the first stage evidence the trial court administered two instructions concerning the use of impeachment evidence. Instruction No. 17 stated:

> Evidence has been presented that on some prior occasion certain witnesses have made statements inconsistent with their testimony in this case. This evidence is called impeachment evidence and it is offered to show that the witness's testimony is not believable or truthful. If you find that a (sic) inconsistent statement was made, you may consider this impeachment evidence in determining what weight and credit to give the testimony of those witness's (sic). You may not consider this impeachment evidence as proof of innocence or guilt. You

may consider this impeachment evidence only to the extent that you determine it affects the believability of the witness, if at all.[22]

Instruction No. 18 provided:

You are instructed that you may consider any prior inconsistent statement made by a witness as substantive evidence in this case.[23]

The State concedes these instructions are contradictory but argues "the effect of Judge Blevins' contradictory instructions was to leave to the jury's discretion how to treat the many prior inconsistent statements of the witnesses."[24] The State maintains that the jury "was the best determiner [sic] of the witnesses' credibility."

■■■ We have consistently held jury instructions are a matter committed to the sound discretion of the trial court, whose judgment will not be disturbed as long as the instructions, taken as a whole, fairly and accurately state the applicable law. *Walker v. State*, 887 P.2d 301, 314 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); *Sadler v. State*, 846 P.2d 377, 386 (Okl.Cr.1993); *Fritz v. State*, 811 P.2d 1353, 1367 (Okl.Cr.1991). It is implicit that in order for jury instructions to accurately state the law they must provide the jury with ample understanding of the issues presented and the standards to be applied. When instructions are self-contradictory on material issues and cannot be harmonized, plain error occurs. *Thomas v. State*, 45 Okl. Cr. 424, 425–26, 283 P. 1037, 1037–38 (1930); *Jay v. State*, 42 Okl.Cr. 32, 36, 274 P. 487, 488 (1929).

In the instant case the trial court administered two completely contradictory instructions on the use of impeachment evidence. As this Court said when reviewing contradictory instructions in *Price v. State*, 1 Okl.Cr. 358, 388–89, 98 P. 447, 460 (1908):

Can instructions which are self-contradictory be harmonious and sufficient? Who can tell which instruction was followed by the jury? If the court did not harmonize the instructions given, how can it be expected that the jury could or would do so? If juries are to pass upon the sufficiency of instructions, then are they not the judges of the law as well as the facts? Instructions should be clear, explicit, and free from ambiguities and contradictions; otherwise they may confuse and mislead the jury.

*See also Anderson v. State*, 90 Okl.Cr. 1, 9, 209 P.2d 721, 725 (1949).

■■■ While it is the trier of fact's duty to determine what weight and credit to give a particular witness' testimony, it has always been and will continue to be the trial court's duty to instruct the trier of fact on the law. *Crawford v. State*, 840 P.2d 627, 638 (Okl.Cr. 1992). This includes the law concerning the use of impeachment evidence. We find untenable the State's argument that the jury could choose what law to follow concerning its use of impeachment evidence. We further find no way in which the jury could have harmonized these two instructions. As discussed above only those inconsistent statements from Jones' trial, Flippo's trial and the preliminary hearing could be used as substantive evidence of guilt, while the inconsistent statements to police could not. Because we do not know whether or not the jury used any or all of the impeachment evidence as substantive evidence of guilt, further review of this case is futile.[25]

## IV. *RONNIE LEE FLOYD*

### A. HEARSAY

■■■ Appellant Floyd challenges the testimony of seven (7) witnesses, claiming the testimony was inadmissible hearsay. Specifically, he directs our attention to testimony given by Patty Arnold, Roberta Lancaster, Rick Boyette, Donald Cargle, Lisa Shepherd

---

22. Omalza O.R. at 3363.

23. Omalza O.R. at 3364.

24. State's Brief in Omalza at 24.

25. Because some of the statements could be used as substantive evidence and some could not, appropriate instructions should be fashioned on retrial to comport with the different types of statements.

and Gayla Hood.[26] We have reviewed Floyd's allegations and the testimony in question and find this case suffers from the same hearsay problems found in the trial of co-defendant Omalza.

Patty Arnold testified in Floyd's trial to incriminating statements made by Patricia Jones. This testimony was introduced by the State as evidence of the conspiracy to kill the victims. Statements made by Jones to Arnold describing the killings and that Floyd, Flippo and Omalza had carried out the murders were made the day after the bodies were found. These statements were therefore made after the accomplishment of the conspiracy's objective—the deaths of Grant and Robinson—and as such were improperly admitted at trial. *See* III A, *supra.*

Testimony by prison guard Rick Boyette was also introduced as evidence in furtherance of the conspiracy. Boyette testified to a phone call between Omalza and a woman concerning the discovery of bodies wherein Omalza told the woman "not to worry." This phone call took place March 17, 1988, after the discovery of the bodies. As it was not made during the duration of the conspiracy, it was improperly admitted at Floyd's trial.

Gayla Hood testified she observed a van similar to Floyd's at the home of Chuck Noland, that she heard a voice coming from inside the van which she believed to be Floyd's, and that she observed "bloody water" running out of the back of the van. This testimony was her own personal observations and therefore was not hearsay. 12 O.S.1981, § 2801(3) (testimony by a witness at trial concerning that witness' personal observations made outside the courtroom is not hearsay).

Roberta Lancaster testified that Jones had asked Lancaster and her sister to hold Kim Grant hostage so that Grant could not testify against Jones. This statement was not made during the conspiracy and was therefore improperly admitted at trial. *See* III A, *supra.*

Lancaster also testified that after the murders Jones had said the "snitching son of a bitches got what they deserved." Assuming this statement was introduced only to show it was made, it is not hearsay. Testimony which is offered to show that a statement was made and not to prove its truth is not hearsay. *Washington v. State*, 568 P.2d 301, 308–09 (Okl.Cr.1977). However, if the statement was offered to prove the truth of the matter asserted, that the victims got what they deserved meaning death, then it is hearsay for which no exception exists. The purpose for introducing this statement is not clear from the record.

However, in this situation, it is not necessary to determine the purpose of the statement as the statement does not pass the test of relevancy. The threshold determination for admissibility of this statement, as with all evidence, is whether it is relevant. Relevant evidence is defined as evidence having any tendency to make the existence of a fact that

---

**26.** In his appellate brief, Floyd also challenges testimony from Pam Hill concerning a statement made by Patricia Jones for Pam Hill "not to plead her case out." The record shows this testimony was given by Deborah Ross and not Pam Hill. No objection was raised to this testimony of Deborah Ross, therefore we find it properly admitted. *Wilson v. State*, 554 P.2d 806, 809 (Okl.Cr.1976) (when alleged hearsay is admitted without objection, the statements may be considered as though they are admissible). *See also Mann*, 749 P.2d at 1158–59.

Floyd also directs our attention to testimony by J. Michael Hull, a forensic document examiner with the Oklahoma City Police Department. Hull testified that State's Exhibits Nos. 67 and 68, a notebook attributed to Jones and a known sample of Jones' handwriting, respectively, were both written by Jones. Contained in the note-book was a notation that Jones would no longer sell drugs to the victim, Kim Grant. No contemporaneous objection was raised to this testimony, therefore the testimony is considered properly admitted. *Id.*

In a supplemental brief, Floyd asserts the State attempted to introduce prejudicial hearsay evidence during the testimony of Gary Jones and Otto Hembre. Raising new propositions of error in a supplemental brief is strictly prohibited. 22 O.S.1991, Ch. 18, App., *Rules of the Court of Criminal Appeals*, Rule 3.4(F). Propositions of error raised for the first time in a supplemental brief shall be deemed forfeited for consideration. *See Brown v. State*, 871 P.2d 56, 68 (Okl.Cr.), *cert. denied,* —— U.S. ——, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994); *Castro v. State*, 745 P.2d 394, 404 (Okl.Cr.1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988).

is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 12 O.S.1981, § 2401. We find this statement is not relevant as it has no tendency to make Floyd's participation in the murders more or less probable. Therefore whether the statement falls under a hearsay exception is not a factor in the determination of its admissibility. Its lack of relevance precludes its admission at trial.

■ Donald Cargle, incarcerated with Omalza at McLeod Correctional Center from January to March of 1988, testified to certain conversations he had with Omalza concerning Patricia Jones. When Cargle admitted testifying differently on a previous occasion, the State was allowed to read from the transcript of a "deposition"[27] and the transcript of Cargle's testimony given at co-defendant Flippo's trial.

■ In the sworn statement and at Flippo's trial, Cargle testified that Omalza had told him of the plan to kidnap Grant and Robinson by luring them with a drug sale; that Floyd was to take the victims to his father's house, threaten and scare them and if that did not work, "take them to the lake;" and that Floyd had told Omalza the victims had been killed. Cargle's testimony from Flippo's trial was properly admissible under 12 O.S.1981, § 2801(4)(a)(1) as prior inconsistent statements which could be considered by the jury as substantive evidence. However, his statement to the police could only be used for impeachment purposes. See III B, supra.

■ Floyd also challenges the admission of testimony by Lisa Shepherd. Shepherd initially pled the Fifth Amendment to the State's inquiries about Floyd. However, when asked if she had ever testified differently, she replied that she could not remember. The State then read Ms. Shepherd's testimony from Flippo's trial. At that trial Shepherd testified she lived with Floyd during the early part of 1988; that Flippo would visit Floyd often, specifically during March of 1988; that one day in March Floyd told her to leave the house and not to come back for a while; that when she returned that evening she saw a man and a woman tied up and lying on plastic and Floyd explained that it was only a scare tactic to get the two to pay a debt; that Floyd, Flippo and Patricia Jones were present and that the woman who was tied up was referred to as Kim; and, that a few days after that Floyd told her some people had been murdered and she was going to be his witness. After hearing her previous testimony, Shepherd stated she still did not remember giving the testimony, but she did not contest the accuracy of the transcript.

We find these sworn statements from a previous trial properly admissible as prior inconsistent statements pursuant to 12 O.S. 1981, § 2801(4)(a)(1) which could be considered by the jury as substantive evidence. See III B, supra.

### B. INSTRUCTIONS

The same contradictory instructions given in *Omalza* on the use of prior inconsistent statements for substantive purposes and impeachment purposes were given in this case. These instructions were inadequate to properly inform the jury of the applicable law. See III B, supra.

### V. DAVID LEE FLIPPO

#### A. HEARSAY

Throughout Flippo's trial the defense objected vigorously to the admission of hearsay evidence, and was overruled by the trial court. These alleged errors are thus fully preserved for appellate review. *See Plantz v. State*, 876 P.2d 268, 279 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1130, 130

---

27. This statement, which is referred to in the record as a deposition, but which does not meet the statutory definition of a deposition, is the same sworn statement addressed in Footnotes 19 and 20. The taking of this sworn statement was specifically authorized by 22 O.S.1981, § 749 and therefore satisfies an element of the offense of perjury pursuant to 21 O.S.1981, § 491. However, as previously determined the taking of this sworn statement does not fall within the definition of "other proceedings" as used in 12 O.S.1981, § 2801(4)(a)(1) and could not be used for substantive purposes. This application is consistent with the restraints in Section 749(B) on the use of sworn statements.

L.Ed.2d 1091 (1995). Both parties agree some statements made by coconspirators, which would otherwise be inadmissible hearsay, are admissible under the authority of 12 O.S.1981, § 2801(4)(b)(5). Sharp disagreement divides the parties as to the proper application of this section to the trial testimony.

As in the Omalza trial, the trial court held an *in camera* hearing and determined a conspiracy existed and the defendant was part of it. Also, as in the Omalza trial, when the State sought to admit coconspirator statements at trial, the court did not apply the limits of time and content required by Section 2801(4)(b)(5). The prosecutor argued, and unfortunately the trial court agreed, that *any* statement made at *any time* to *anyone* by a coconspirator was admissible. As a result, vast amounts of inadmissible hearsay flooded Flippo's trial. Those statements which also were admitted in the Omalza trial and have been addressed earlier in this opinion will not be reconsidered here.

The ultimate issue, of course, is whether the admission of hearsay requires reversal. To answer this question we will first determine which coconspirator statements should have been excluded, and then weigh their effect against the properly admitted evidence of guilt. To accomplish this task we will sort the statements of coconspirators twice: first to determine which were made during the course of the conspiracy; and then *of those statements*, which were also made to further it.

▮▮▮ Most of the coconspirator statements introduced at trial were not made during the conspiracy. Two of these were particularly damaging: Cargle and Arnold testified to statements identifying Flippo as one of the killers. Other statements made during the conspiracy did not further it. These did not satisfy the content requirement of section 2801(4)(b)(5) and should have been excluded from trial. This category includes Cargle's testimony to details of Omalza's telephone conversations with Floyd and Jones which Omalza relayed to him after hanging up.

▮▮▮ Separate and distinct from coconspirator hearsay, inadmissible hearsay from a declarant who was not a coconspirator was also admitted at trial when investigator Mike Burke testified Chuck Noland told him Flippo was involved in the murders.

▮▮▮ The State urges the admissible evidence is sufficient to show guilt beyond a reasonable doubt, and the admission of this hearsay should be found harmless. In order to find the admission of hearsay harmless, the evidence must be such that the Court can find beyond a reasonable doubt that the inadmissible hearsay did not contribute to the conviction. *Booker v. State*, 851 P.2d 544, 547 (Okl.Cr.1993); *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–11.

▮▮▮ Applying this standard to the trial testimony, we look first to all of the properly introduced evidence which could support a finding of guilt. Flippo and Ronnie Floyd were friends. Robinson carried a gun to protect himself from Flippo. Flippo said in the presence of Gayla Hood, "two snitches were taken care of," or "I took care of two snitches." Hood also heard him say he was leaving Oklahoma City while things cooled off. Flippo told Richard Dixon in August, 1988 that he knew "two people who will not ever rat on anybody again;" and that when the male snitch tried to escape Flippo, "grabbed him by the hair and slit his throat." The evidence introduced through Cargle and Dixon was significantly weakened by impeachment.

This meager admissible evidence was enhanced significantly by (1) Pat Arnold's coherent story of the commission of these crimes, and her corroboration of seriously impeached testimony; and (2) three separate witnesses naming Flippo as the murderer. Absent this hearsay we are not persuaded beyond a reasonable doubt the appellant would have been convicted. We must therefore reverse and remand the case for retrial. *Id.; Booker*, 851 P.2d at 547.

## B. USE OF PERJURED TESTIMONY

▮▮▮ In his third proposition of error Flippo claims the State knowingly used perjured or demonstrably false testimony from

Patty Arnold and Richard Dixon. This, the appellant argues, constitutes both prosecutorial misconduct and an independent violation of federal and state due process. He further argues the State failed in its obligation to disclose the two year reduction in sentence Donnie Cargle received in return for his help in the case, and then misled the jury when this evidence was found independently by the defense.

As we have determined Patty Arnold's prejudicial testimony to Flippo was not properly admitted, we will not examine the testimony further. We will address the issue of the allegedly perjured testimony of Richard Jerry Dixon and Lisa Shepherd.

 "The knowing use of false or misleading evidence important to the prosecution's case in chief violates the Due Process Clause of the Fourteenth Amendment." *McCarty v. State*, 765 P.2d 1215, 1219 (Okl. Cr.1988). *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 438–39 (1974); *Miller v. Pate*, 386 U.S. 1, 7, 87 S.Ct. 785, 788, 17 L.Ed.2d 690, 694 (1967). To prove the claim on appeal the appellant bears the burden to establish (1) certain testimony was misleading, (2) the prosecution knowingly used the testimony and (3) the testimony was material to guilt or innocence. *McCarty*, 765 P.2d at 1219.

Dixon's credibility was undeniably impeached. He testified he was represented by a Harvard law professor when in fact his "counsel" was a jail-house lawyer. As the medical testimony established Robinson's throat was slit after his death, Dixon's testimony regarding Flippo's statement that he slit the throat of a "snitch" when the "snitch" tried to escape was impeached. In context it is impossible to know whether Flippo made the untrue statement, or whether Dixon made it up. In either case impeachment significantly weakened the force of the testimony. However, nothing on the record supports a finding the prosecution knew, prior to his testimony, that Dixon's testimony would be misleading. As the second prong of the *McCarty* test is not satisfied, the appellant has not met his burden in this charge. Shepherd's credibility was also impeached. How-ever, again, we find nothing in the record to support a finding the prosecution knowingly used misleading testimony.

 Regarding the deal struck with Donnie Cargle, the defense discovered this fact during trial when it received a Department of Corrections document which stated Cargle was released early for his assistance in the prosecution of two murder suspects. In its brief the State responds there is no evidence to indicate the State knew about the early release. This position begs the question for the State has an affirmative duty to reveal to the defense the deals it makes with witnesses. *Mays v. State*, 594 P.2d 777, 779 (Okl.Cr.1979). More importantly, it is also plainly contradicted by the record.

Prosecutor Stensaas asked Cargle why he was released early; he replied, "For my protection." The record clearly shows the prosecution attempted to thwart every defense effort to place before the jury the fact that Cargle received two years off his sentence for assisting in the prosecution. This is error. The purpose of requiring the State to divulge this information is to allow the jury to test the witness' credibility. *Id.*

## C. DENIAL OF CONFRONTATION

 After she testified, Lisa Shepherd contacted defense counsel from the county jail asking to discuss her testimony. She met with defense counsel and stated she wanted to withdraw her testimony. Counsel tape recorded the conversation and deputy Rochelle Hatfield witnessed it. At an *in camera* hearing Shepherd, who was represented by counsel, denounced the attempt to withdraw her testimony, and stated she would "stand on her former testimony."

Following the *in camera* hearing the defense called Shepherd to the stand, and she refused to answer the questions posed to her. The defense then called Hatfield. The prosecution objected, and the defense made an offer of proof. In the ensuing *in camera* hearing Hatfield testified she heard Shepherd say she did not know "what's right or wrong" or whether her testimony was "fact or fantasy." The trial court disallowed Hatfield's testimony, agreeing with the State

that it would be inadmissible hearsay. This was error.

When Shepherd became unavailable by refusing to testify, Section 2804(B)(3) of the Evidence Code allowed admission of Hatfield's testimony. Section 2804(B)(3) provides:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

3. A statement which ... at the time of its making ... tended to subject [a declarant] to ... criminal liability....

12 O.S.1981, § 2804(B)(3). After having sworn to tell the truth Shepherd nullified her oath by stating she did not know what was true and what was not. This exposed her to the possible charge of perjury.

█ Whether the exclusion of this evidence may be found harmless depends on five factors: (1) the importance of the testimony, (2) its cumulativeness, (3) the presence or absence of corroborative or contradicting evidence, (4) the extent of cross-examination allowed, and (5) the overall strength of the State's case. *Beck v. State*, 824 P.2d 385, 390 (Okl.Cr.1991).

Applying this test, we find Shepherd's eyewitness testimony was very important to the State's case. She placed Flippo with the victims, and testified he said they should, "kill the snitching son-of-a-bitch and bitch." The testimony was not cumulative, and it was not corroborated by credible evidence. Shepherd was not examined about her inability to know truth from fiction for she refused to testify when called by the defense. Given the weakness of the prosecution's case, and the importance of this testimony, we find the trial court committed reversible error in prohibiting the testimony of Rochelle Hatfield.[28]

Flippo goes on to argue that because Donnie Cargle and Lisa Shepherd recanted their testimony at the subsequent trials of Omalza and Floyd, their testimony in Flippo's case was perjured. This evidence is not before us on the record, and we make no ruling on it.

█ Nancy Huffines of the Tennessee Department of Health was called to introduce the psychiatric records of Lisa Shepherd. Following an *in camera* hearing the trial court sustained the State's objection to this witness. Flippo argues this denied him his right to confront witnesses and present a defense. These records are privileged and not subject to admission at trial absent Shepherd's consent. 12 O.S.1981, § 2503. Shepherd did not waive her privilege, and the trial court properly prohibited use of the records.

Citing *New Hampshire v. Farrow*, 116 N.H. 731, 366 A.2d 1177 (1976) and *State v. D'Ambrosia*, 212 Conn. 50, 561 A.2d 422, *cert. denied*, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990), Flippo argues further that under the circumstances Shepherd's privilege must give way to his right to cross-examine her. This argument is not persuasive for the defense cross-examined Shepherd extensively regarding her drug usage, mental problems, and confinement in a mental hospital. Flippo was not denied his right to confront this witness.

In his next argument the appellant concedes his position that he should have been allowed to present evidence that "Rob" Robinson had reason to be afraid of others besides Flippo is against the holding of *Woodruff v. State*, 846 P.2d 1124 (Okl.Cr.), *cert. denied*, —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993) and *Romano v. State*, 847 P.2d 368 (Okl.Cr.1993), *aff'd*, 512 U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). We find these cases controlling and do not revisit the issue. Flippo raises several issues concerning endorsement of witnesses, admission of other crimes evidence and admission of exhibits. We find no reversible error in any of these issues.

## D. PROSECUTORIAL MISCONDUCT

Flippo argues numerous instances of prosecutorial misconduct warrant a new trial. Flippo first points to instances during voir dire. We have reviewed the statements and find the trial court cured any error by sus-

---

**28.** If the Shepherd testimony from this trial were to be used in the subsequent trial of any coconspirator, the Hatfield testimony also would be admissible in the subsequent trial.

taining defense objection, or the statements complained of were not error.

 Flippo next challenges the opening statement. The prosecutor stated Pat Jones' attorney would testify regarding the advice he gave her in regard to her defense, and that Flippo's wife would testify that he admitted to participating in the murders. This evidence was not introduced at trial. The opening statement was therefore improper. *McGaha v. State*, 492 P.2d 1101, 1103 (Okl. Cr.1971); *Harvell v. State*, 395 P.2d 331, 338 (Okl.Cr.1964), *overruled on other grounds, Buis v. State*, 792 P.2d 427 (Okl.Cr.1990). The error is reversible only if made in bad faith and prejudicial to the defendant. *Shultz v. State*, 811 P.2d 1322, 1328 (Okl.Cr. 1991).

Given the attorney/client privilege and marital privilege, the prosecutor had to know this evidence would not be introduced ·at trial. The Court is hard pressed to imagine how these statements could be made in good faith. They underscore an apparent prosecution strategy to put as much before the jury as possible, admissible or not. When we complete the analysis by determining prejudice, we find one statement is prejudicial and the other is not. The statement regarding Pat Jones' attorney is not prejudicial to the appellant. The statement that his wife would testify he admitted to the killings is highly prejudicial, and warrants reversal.

 Next Flippo challenges misconduct in first stage closing. He argues the prosecutor embellished the evidence, and gave her personal opinion of guilt when she said, "The defendant is the one who did the cutting. He is the one who thrust the sword". This assertion of personal opinion of guilt is error. *Allen v. State*, 761 P.2d 902, 903 (Okl.Cr.1988); *Tart v. State*, 634 P.2d 750, 751 (Okl.Cr.1981); *McCarty*, 765 P.2d at 1220. Prosecutor Stensaas informed the jury the State had more evidence of guilt than it could present. This, too, is error. *See United States v. Hilliard*, 569 F.2d 143, 144 (D.C.Cir.1977); *United States v. Humer*, 542 F.2d 254, 255 (5th Cir.1976). This comment, in conjunction with her remarks in opening statement regarding evidence barred by privilege, is telling indeed. These errors in union with the many other trial errors require reversal.

## E. JURY INSTRUCTION

### DEMURRER AND MOTION FOR DIRECTED VERDICT

The second challenge to jury instruction focuses on the question of the relationship between a demurrer to the evidence and a motion for directed verdict, as well as the duty of the trial court to instruct the jury when either is granted. When the State rested, the defense demurred to the evidence on all six counts. The trial court granted the demurrer as to four counts: two counts of kidnapping and two counts of conspiracy. When the case was given to the jury, the trial court instructed only on the remaining murder counts.

Relying on *Murphy v. State*, 666 P.2d 236 (Okl.Cr.1983) and *Smith v. State*, 79 Okl.Cr. 1, 151 P.2d 74 (1944), Flippo argues the trial court erred by refusing to instruct the jury to return a directed verdict of not guilty on the counts of kidnapping and conspiracy as provided in 22 O.S.1981, § 850.

 In order to address the merits of this issue, we must place it in its larger context. Two systems of criminal procedure have developed side by side to allow the defendant to challenge the sufficiency of the State's case: the demurrer to the evidence rooted deeply in the common law, and the motion for directed verdict, a creature of statute. *See e.g., Bisanar v. State*, 93 Okla. Cr. 7, 223 P.2d 795 (1950); *Simonton v. State*, 94 Okla.Cr. 274, 235 P.2d 542 (1951); *Davidson v. State*, 330 P.2d 607 (Okl.Cr. 1958); *Kirby v. State*, 505 P.2d 504 (Okl.Cr. 1973); *Stover v. State*, 674 P.2d 566 (Okl.Cr. 1984). Regardless of the status of the demurrer in state civil practice, or federal practice, this dual system is both anticipated and approved by the State Code of Criminal Procedure which provides:

> The procedure, practice and pleadings in the courts of record of this State, in criminal actions or in matters of criminal nature, not specifically provided for in this code, shall be in accordance with the pro-

cedure, practice and pleadings of the common law.

22 O.S.1981, § 9. While section 850 specifically allows the trial court to instruct the jury to acquit, its discretionary language neither mandates a motion for directed verdict, nor supersedes the demurrer:

> If, at any time after the evidence on either side is closed, the court deem it insufficient to warrant a conviction, it may advise the jury to acquit the defendant. But the jury are not bound by the advice, nor can the court, for any cause, prevent the jury from giving a verdict.

22 O.S.1981, § 850. The *Murphy* Court opined the demurrer had indeed been replaced by the motion for directed verdict.

> [T]he proper practice to attack the sufficiency of the evidence is a motion for directed verdict under 22 O.S.1971, § 850, and a demurrer to the evidence should be treated as a motion to direct a verdict. . . .

*Murphy*, 666 P.2d at 236. However, the demurrer has thrived with robust vitality in criminal trial practice. *See e.g., Pierce v. State*, 878 P.2d 369 (Okl.Cr.1994); *State v. Ramsey*, 868 P.2d 709 (Okl.Cr.1993); *Berry v. State*, 834 P.2d 1002 (Okl.Cr.1992). Indeed, in the heat of the trial before us, defense counsel demurred at the close of the State's case.

That these two procedural tools have been used interchangeably for generations does not mean they are the same, nor does the fact that the trial court applies an identical analysis to determine whether either shall be granted. It is in timing and consequences that the distinctions between the two matter.

■■■ The demurrer to the State's evidence must be imposed at the close of the State's case, and failure to do so constitutes waiver. *See Cotton v. State*, 679 P.2d 1305, 1306 (Okl.Cr.1984). A motion for directed verdict, on the other hand, may be made after the evidence for either side is closed. 22 O.S.1991, § 850. We interpret this to mean after either party's case in chief, as well as following rebuttal.

■■■ If a demurrer is granted, the charge is dismissed, and it does not go to the jury. If a motion for directed verdict is granted, the mandate of Section 850 must be followed. The charge shall be submitted to the jury with instructions advising acquittal of the defendant, *and* informing the jury it is not bound to follow the advice. 22 O.S.1981, § 850. Any inconsistent language in previous cases is expressly overruled.[29]

In the present case the trial court granted Flippo's demurrer to four counts at the close of the State's case. Since the demurrer was sustained, these counts properly were not given to the jury. At the close of rebuttal the defense moved for directed verdict on the murder counts, and this motion properly was denied. The trial court committed no error.

Flippo's final challenge to jury instructions addresses venue. He argues venue is a jury question and the trial court erred by denying his request to submit it to the jury. This issue was also raised in the Omalza appeal, and denied. *See* II, *supra.*

The Judgment and Sentence imposed against David Lee Flippo is **REVERSED** and **REMANDED** for retrial on the grounds of improper admission of hearsay, denial of impeachment, prosecutorial misconduct, and failure to provide the defense with proper notice of witness testimony.

## CONCLUSION

We implore the trial court, the prosecution and defense counsel to make specific objections and rulings on retrial. These trials were conducted in such a fashion that review was extremely difficult. Evidence was admitted over non-specific objections, without specific responses by the prosecution and the basis of many rulings was not readily discernable. We note the rulings this Court made with respect to relevancy are not binding on retrial since evidence may be relevant in one case and irrelevant in another. Fur-

**29.** *See Findley v. State*, 11 Okl.Cr. 275, 278, 145 P. 1107, 1108 (1915); *Files v. State*, 16 Okl.Cr. 363, 367, 182 P. 911, 912 (1919); *Davis v. State*, 16 Okl.Cr. 372, 374, 182 P. 908 (1919); *Nail v. State*, 18 Okl.Cr. 40, 43, 192 P. 592, 593 (1920); *Johnson v. State*, 564 P.2d 664, 666 (Okl.Cr. 1977); *Murphy*, 666 P.2d at 237; *Jones v. State*, 772 P.2d 922, 925 (Okl.Cr.1989).

ther, such evidence may be relevant for different reasons. If relevancy objections arise on retrial, the parties should state on the record the reasons the evidence is being offered. Finding error which requires reversal, these cases are **REVERSED** and **REMANDED** for new trial.

JOHNSON, P.J., and LUMPKIN and STRUBHAR, JJ., concur.

CHAPEL, V.P.J., and LANE, J., concur in results.

LANE, Judge, concurring in results.

Two issues cause me to write separately: the admission of irrelevant evidence, and the conflict between the instructions on the use of prior inconsistent statements.

The very significant hearsay problems in this case have created a tendency toward tunnel vision. That certain evidence is not prohibited as hearsay only begins the analysis of the question of admissibility. We must also ask—is it relevant? If it is not, it should not be admitted at trial.

On the basis of relevancy I would exclude the following from *Omalza's* trial: (1) Jones' statement to Arnold that "Kim was dead"; (2) Jones' statements to Omalza about a birthday cake that had been ordered from the pharmacy and the plan to kill Allen Beard; (3) Jones list of "no people"; (4) Hill's testimony that Jones stored pistols in her home. These statements do not make Omalza's guilt or innocence more or less probable. That they are not hearsay does not change the fact they are not relevant, and not admissible.

It is plain to me that the trial judge correctly decided to instruct on the two uses of prior inconsistent statements: as impeachment only, and as substantive evidence of guilt. The trial judge could have avoided the fatal conflict between the two had he instructed the jury that those statements given under oath in a prior trial or hearing subject to cross-examination and penalty of perjury could be considered substantively and those which were not could be considered for impeachment only, the irreconcilable conflict between the instructions could have been avoided. The difficulty presented here

brings into sharp focus the need for the trial bench to review their jury instructions in the context of the trial at hand.